Anne L. Weismann
D.C. Bar No. 298190
Kimberly D. Perkins
D.C. Bar No. 481460
Citizens for Responsibility
and Ethics in Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C.  20005
202-408-5565

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON<br>1400 Eye Street, N.W., Suite 450<br>Washington, D.C.  20005<br><br>Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY<br>Washington, D.C.  20528<br><br>Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:  Civil Action No.<br>:<br>:<br>:<br>:<br>:<br>: |

---

## COMPLAINT FOR
## DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

1.  This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, as amended and agency FOIA regulations challenging the failure of the U.S. Department of Homeland Security ("DHS"), and several of its component agencies, to fulfill the requests of plaintiff for documents relating to former high-level officials within DHS and contracts entered

into between the former DHS officials' consultant and lobbying firms and DHS.

2. This case seeks declaratory relief that DHS, and its agency components, are in violation of the FOIA and DHS regulations, 6 C.F.R. Part 5, for failing to fulfill plaintiff's requests for records and injunctive relief that DHS immediately and fully comply with plaintiff's requests under the FOIA.

## JURISDICTION AND VENUE

3. This Court has both subject matter jurisdiction over this action and personal jurisdiction over DHS, and its agency components, pursuant to 5 U.S.C. § 552(a)(4)(B). This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331. Venue lies in this district under 5 U.S.C. § 552(a)(4)(B).

## PARTIES

4. Plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") is a non-profit corporation, organized under section 501(c)(3) of the Internal Revenue code. CREW is committed to protecting the right of citizens to be informed about the activities of government officials and to ensuring the integrity of government officials. CREW seeks to empower citizens to have an influential voice in government decisions and in the governmental decision-making process through the dissemination of information about public officials and their activities. To advance its mission, CREW uses a combination of research, litigation and advocacy. As part of its research, CREW uses government records made available to it under the FOIA.

5. CREW has invested considerable organizational resources in pushing the U.S. government to take ethics issues seriously. CREW monitors closely the laws and rules applicable to government agencies.

6. CREW is harmed by DHS's failure to comply with the FOIA, because that failure harms CREW's ability to provide full, accurate and current information to the public. 5 U.S.C. § 552(a)(6)(c). Absent this critical information, CREW cannot advance its mission of educating the public to ensure that the public continues to have a vital voice in government.

7. CREW will analyze the information it receives that is responsive to its request and will share it with the public through memoranda, reports, or press releases. In addition, CREW will disseminate any documents it acquires from its request to the public through its website, www.citizensforethics.org. Currently, the CREW website contains links to thousands of pages of documents acquired from multiple FOIA requests. See http://citizensforethics.org/activities/foia/php. Visitors to CREW's website can peruse the FOIA request letters, the responses from government agencies and a growing number of documents responsive to CREW's FOIA requests. CREW's virtual reading room provides around-the-clock access to anyone seeking to learn about the government activities that were the focus of CREW's FOIA requests. The CREW website also includes documents relating to CREW's FOIA litigation, Internal Revenue Service complaints and Federal Election Commission complaints and reports CREW has written based on documents CREW acquired through the FOIA.

8. Defendant DHS is an agency within the meaning of 5 U.S.C. § 552(f) and 5 U.S.C. § 702. DHS is the federal agency with possession and control of the requested records and is responsible for fulfilling plaintiff's FOIA requests.

## STATUTORY FRAMEWORK

### The Freedom of Information Act

9. The FOIA, 5 U.S.C. § 552, requires agencies of the federal government to release

requested records to the public unless one or more specific statutory exemptions apply.

10. An agency must respond to a party making a FOIA request within 20 working days, notifying that party of at least the agency's determination whether or not to fulfill the request and of the requester's right to appeal the agency's determination to the agency head. 5 U.S.C. § 552(a)(6)(A)(i).

11. An agency must respond to a FOIA appeal within 20 working days, notifying the appealing party of the agency's determination to either release the withheld records or uphold the denial. 5 U.S.C. § 552(a)(6)(A)(ii).

12. In "unusual circumstances," an agency may delay its response to a FOIA request or appeal, but must provide notice and "the date on which a determination is expected to be dispatched." 5 U.S.C. § 552(a)(6)(B).

13. The FOIA also requires each agency to promulgate regulations specifying a fee schedule for the processing of FOIA requests and establishing procedures and guidelines for the waiver or reduction of fees. 5 U.S.C. § 552(a)(4)(A). Defendant DHS's fee waiver regulations are found at 6 C.F.R. § 5.11. Both the FOIA and DHS regulations provide that documents should be produced at no charge to the requester or at a reduced charge if "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii); 6 C.F.R. § 5.11.

14. This Court has jurisdiction, upon receipt of a complaint, "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B).

15.  The FOIA provides a mechanism for disciplinary action against agency officials who have acted inappropriately in withholding records.  Specifically, when requiring the release of improperly withheld records, if the Court makes a written finding that "the circumstances surrounding the withholding raise questions whether agency personnel acted arbitrarily or capriciously," a disciplinary investigation is triggered.  5 U.S.C. § 552(a)(4)(F).

## FACTS GIVING RISE TO PLAINTIFF'S CLAIMS FOR RELIEF

16.  On June 18, 2006, *The New York Times* reported on the lucrative careers at least 90 former DHS officials have secured upon leaving DHS.  Eric Lipton, Former Antiterror Officials Find Industry Pays Better, *The New York Times*, June 18, 2006 (attached as Exhibit A). The article states that "dozens of members of the Bush administration's domestic security team . . . are now collecting bigger paychecks in different roles: working on behalf of companies that sell domestic security products, many directly to the federal agencies the officials once helped run." Id.  The article further details the post-DHS activities of several specific former DHS officials, including former DHS secretary Tom Ridge, former DHS under secretary Asa Hutchison and former deputy secretary Adm. James M. Loy; where these former officials now work as executives, consultants or lobbyists; and how much money their new clients make with contracts they enter into with DHS.  Id.

17.  Other articles describe DHS's revolving door and the salaries former DHS officials command in the private sector, while they do business with their former employer DHS, which dwarf their government paychecks.  See Eric Lipton, Dozens of federal counter-terrorism employees have left for private-sector jobs dealing with their former agencies, *St. Paul Pioneer Press*, June 18, 2006 (attached as Exhibit B); Sarah Posner, Security for Sale; The Department of

Homeland Security has a section on its Web site labeled "Open for Business." It certainly is, *The American Prospect*, January 5, 2006 (attached as Exhibit C); Steve Goldstein, Ridge lands first big client - Albania; Ex-Governor launches international consulting business, *Pittsburgh Post-Gazette*, December 31, 2006 (attached as Exhibit D).

18.  Articles also describe the level of waste and abuse within DHS as it contracts with outside security firms and entities, many of which now employ former high-level DHS officials. See Scott Higham and Robert O'Harrow, Jr., Contracting Rush for Security Led to Waste, Abuse, *The Washington Post*, May 22, 2005 (attached as Exhibit E); Rep. Pascrell Lashes Out at Irresponsible Department of Homeland Security Contracts, *US Fed News*, May 18, 2006 (attached as Exhibit F).

## Plaintiff's FOIA Requests and Follow-Up

## TSA FOIA

19.  On March 7, 2007, CREW sent a FOIA request by first-class mail to the Transportation Security Administration ("TSA"), a component agency within DHS, seeking records, regardless of format and including electronic records and information, regarding procurement actions between former high-ranking DHS officials Chad Wolf, Tom Blank, Ashley Davis, Mark Holman and C. Stewart Verdery, Jr., their consulting or lobbying firms and the TSA.  Letter from Kimberly D. Perkins to Sophia Young, FOIA Officer/Public Liaison, March 7, 2007 (attached as Exhibit G).  CREW also sought "phone logs, meeting records or schedules between employees of the TSA and any employee of Wexler & Walker, Blank Rome, LLP and Monument Policy Group," the consulting or lobbying firms for which the former officials work. Id.

20. CREW also sought a waiver of fees associated with processing its request given that the request concerns the operations of the federal government, the disclosures will likely contribute to a better understanding of relevant government procedures and the request is primarily and fundamentally for non-commercial purposes. Id.

21. By letter dated March 29, 2007, TSA acknowledged receipt of CREW's FOIA request and advised CREW that it was denying CREW's request for a fee waiver. Letter from Kevin J. Janet, FOIA Officer to Kimberly Perkins, March 29, 2007 (attached as Exhibit H).

22. By letter dated May 1, 2007, CREW appealed TSA's denial of its request for a fee waiver, demonstrating that CREW was entitled to a complete waiver of fees pursuant to TSA's six-part criteria. Letter from Kimberly D. Perkins to Kimberly Walton, May 1, 2007 (attached as Exhibit I).

23. CREW has received no other response from TSA regarding CREW's March 7, 2007 FOIA request, or its May 1, 2007 appeal. CREW has now exhausted its administrative remedies with respect to the processing of CREW's FOIA request. See, e.g., Oglesby v. U.S. Dep't of Army, 920 F.2d 57, 65 (D.C. Cir. 1990).

## ICE FOIA

24. On March 7, 2007, CREW sent a FOIA request by first-class mail to U.S. Immigration & Customs Enforcement ("ICE"), a component agency within DHS, seeking records, regardless of format and including electronic records and information, regarding procurement actions between former high-ranking DHS officials C. Suzanne Mencer, C. Steward Verdery, Jr., Chad Wolf, Tom Blank, Ashley Davis and Mark Holman, their consulting or lobbying firms and ICE. Letter from Kimberly D. Perkins to Catrina Pavlik-Keenan, FOIA

Officer, March 7, 2007 (attached as Exhibit J).  CREW also sought "phone logs, meeting records or schedules between employees of ICE and any employee of Brownstein Hyatt & Farber, P.C., Wexler & Walker, Blank Rome, LLP and Monument Policy Group," the consulting or lobbying firms for which the former officials work.  Id.

25.  CREW also sought a waiver of fees associated with processing its request given that the request concerns the operations of the federal government, the disclosures will likely contribute to a better understanding of relevant government procedures and the request is primarily and fundamentally for non-commercial purposes.  Id.

26.  CREW has received no response from ICE regarding CREW's March 7, 2007 FOIA request.

27.  CREW has now exhausted its administrative remedies with respect to the processing of CREW's FOIA request.  See, e.g., Oglesby v. U.S. Dep't of Army, 920 F.2d at 65.

## CUSTOMS FOIA

28.  On March 7, 2007, CREW sent a FOIA request by first-class mail to the U.S. Customs & Border Protection ("Customs"), a component agency within DHS, seeking records, regardless of format and including electronic records and information, regarding procurement actions between former high-ranking DHS officials Chad Wolf, Tom Blank, Ashley Davis, Mark Holman, C. Stewart Verdery, Jr., C. Suzanne Mencer, their consulting or lobbying firms and Customs.  Letter from Kimberly D. Perkins to Shari Suzuki, FOIA Officer/Public Liaison, March 7, 2007 (attached as Exhibit K).  CREW also sought "phone logs, meeting records or schedules between employees of Customs and any employee of  Brownstein Hyatt & Farber, P.C., Wexler & Walker, Blank Rome, LLP and Monument Policy Group," the consulting or lobbying firms for

which the former officials work.  Id.

29.  CREW also sought a waiver of fees associated with processing its request given that the request concerns the operations of the federal government, the disclosures will likely contribute to a better understanding of relevant government procedures and the request is primarily and fundamentally for non-commercial purposes.  Id.

30.  CREW has received no response from Customs regarding CREW's March 7, 2007 FOIA request.

31.  CREW has now exhausted its administrative remedies with respect to the processing of CREW's FOIA request.  See, e.g., Oglesby v. U.S. Dep't of Army, 920 F.2d at 65.

### FEMA FOIA

32.  On March 7, 2007, CREW sent a FOIA request by first-class mail to the Federal Emergency Management Agency ("FEMA"), a component agency within DHS, seeking records, regardless of format and including electronic records and information, regarding procurement actions between former high-ranking DHS officials C. Suzanne Mencer, Chad Wolf, Tom Blank, their consulting or lobbying firms and FEMA.  Letter from Kimberly D. Perkins to Jeff Ovall, FOIA Officer/Public Liaison, March 7, 2007 (attached as Exhibit L).  CREW also sought "phone logs, meeting records or schedules between employees of FEMA and any employee of Brownstein Hyatt & Farber, P.C. and Wexler & Walker," the consulting or lobbying firms for which the former officials work.  Id.

33.  CREW also sought a waiver of fees associated with processing its request given that the request concerns the operations of the federal government, the disclosures will likely contribute to a better understanding of relevant government procedures and the request is

primarily and fundamentally for non-commercial purposes.  Id.

34.  CREW has received no response from FEMA regarding CREW's March 7, 2007

FOIA request.

35.  CREW has now exhausted its administrative remedies with respect to the processing

of CREW's FOIA request.  See, e.g., Oglesby v. U.S. Dep't of Army, 920 F.2d at 65.

### U.S. COAST GUARD FOIA

36.  On March 7, 2007, CREW sent a FOIA request by first-class mail to the U.S. Coast

Guard , a component agency within DHS, seeking records, regardless of format and including

electronic records and information, regarding procurement actions between former high-ranking

DHS officials Chad Wolf, Tom Blank, C. Steward Verdery, Jr., C. Suzanne Mencer and Deborah

Rosenblum, their consulting or lobbying firms and the Coast Guard.  Letter from Kimberly D.

Perkins to FOIA Coordinator, March 7, 2007 (attached as Exhibit M).  CREW also sought

"phone logs, meeting records or schedules between employees of the Coast Guard and any

employee of  Brownstein Hyatt & Farber, P.C., Wexler & Walker, Blank Rome, LLP and

Monument Policy Group and the Cohen Group," the consulting or lobbying firms for which the

former officials work.  Id.

37.  CREW also sought a waiver of fees associated with processing its request given that

the request concerns the operations of the federal government, the disclosures will likely

contribute to a better understanding of relevant government procedures and the request is

primarily and fundamentally for non-commercial purposes.  Id.

38.  By letter dated May 8, 2007, CREW received documents related to one of its 11

items requested in its March 7, 2007 FOIA request to the Coast Guard.  The letter accompanying

the documents did not mention any of the remaining 10 items covered in CREW's FOIA request and did not specify any appeal rights related to those items.  Letter from Jeffrey A. Cross to CREW, May 8, 2007 (attached as Exhibit N).

39.  CREW has received no other response from the Coast Guard regarding CREW's March 7, 2007 FOIA request.

40.  CREW has now exhausted its administrative remedies with respect to the processing of CREW's FOIA request.  See, e.g., Oglesby v. U.S. Dep't of Army, 920 F.2d at 65.

## U.S. SECRET SERVICE FOIA

41.  On March 7, 2007, CREW sent a FOIA request by first-class mail to the U.S. Secret Service ("Secret Service"), a component agency within DHS, seeking records, regardless of format and including electronic records and information, regarding procurement actions between former high-ranking DHS officials C. Stewart Verdery, Jr., Chad Wolf, and Tom Blank, their new consulting or lobbying firms, and the Secret Service.  Letter from Kimberly D. Perkins to Latita Huff, FOIA Officer/Public Liaison, March 7, 2007 (attached as Exhibit O).  CREW also sought "phone logs, meeting records or schedules between employees of the Secret Service and any employee of Wexler & Walker and Monument Policy Group," the consulting or lobbying firms for which the former officials work.  Id.

42.  CREW also sought a waiver of fees associated with processing its request given that the request concerns the operations of the federal government, the disclosures will likely contribute to a better understanding of relevant government procedures and the request is primarily and fundamentally for non-commercial purposes.  Id.

43.  By letter dated April 27, 2007, the Secret Service acknowledged receipt of CREW's

11

FOIA request and advised CREW that its fee waiver request had been denied. Letter from Kathy J. Lyerly to Kimberly Perkins, April 27, 2007 (attached as Exhibit P).

44. By letter dated May 2, 2007, CREW appealed the Secret Service's denial of its request for a fee waiver, demonstrating that CREW was entitled to a complete waiver of fees pursuant to the Secret Service's six-part criteria. Letter from Kimberly D. Perkins to Deputy Director, May 2, 2007 (attached as Exhibit Q).

45. By letter dated July 17, 2007, the Secret Service rejected CREW's fee waiver appeal and confirmed its denial of CREW's request for a fee waiver. Letter from Brian K. Nagel to Kimberly D. Perkins, July 17, 2007 (attached as Exhibit R).

46. CREW has now exhausted its administrative remedies with respect to the processing of CREW's FOIA request. See, e.g., Oglesby v. U.S. Dep't of Army, 920 F.2d at 65.

## PLAINTIFF'S CLAIMS FOR RELIEF

### CLAIM ONE

### (Failure to Produce Records Under the FOIA)

47. Plaintiff realleges and incorporates by reference all preceding paragraphs.

48. Plaintiff properly asked for records within the custody and control of DHS and its component agencies TSA, ICE, Customs, FEMA, U.S. Coast Guard and U.S. Secret Service.

49. Plaintiff is entitled by law to access to the records requested under the FOIA, unless DHS makes an explicit and justified statutory exemption claim.

50. Therefore, DHS violated FOIA's mandate to release agency records to the public by failing to conduct a reasonable search and failing to release all non-exempt records as Plaintiff specifically requested. 5 U.S.C. §§ 552(a)(3)(A), 552(a)(4)(B).

## CLAIM TWO

### (Improper Denial of Fee Waiver)

51.  Plaintiff realleges and incorporates by reference all preceding paragraphs.

52.  Plaintiff has demonstrated that it is entitled to a waiver of fees associated with processing its FOIA requests, because disclosure of responsive records will likely contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the plaintiff.

53.  Therefore, DHS violated FOIA's mandate to grant CREW a fee waiver in the determinations of TSA and the Secret Service that CREW is not entitled to a waiver of fees.  5 U.S.C. § 552(a)(4)(A)(iii); 6 CFR § 5.11.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court:

(1) Declare that DHS has violated the Freedom of Information Act by failing to lawfully satisfy plaintiff's FOIA requests of March 7, 2007, to TSA, ICE, Customs, FEMA, the U.S. Coast Guard and the U.S. Secret Service;

(2) Order DHS to grant CREW's requests for fee waivers;

(3) Order DHS to respond to plaintiff's FOIA requests immediately by conducting a reasonable search and producing all responsive documents;

(4) Award plaintiff reasonable attorney fees and litigation costs in this action, pursuant to 5 U.S.C. § 552(a)(4)(E); and

(5) Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Anne L. Weismann
(D.C. Bar No. 298190)
Kimberly D. Perkins
(D.C. Bar No. 481460)
Citizens for Responsibility and Ethics
  in Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C.  20005
Phone: (20) 408-5565
Fax: (202) 588-5020

Attorneys for Plaintiff

Dated: July 26, 2007

# EXHIBIT A

The New York Times

**June** 18, 2006 Sunday
Correction Appended
Late Edition - Final

# Former Antiterror Officials Find Industry Pays Better

**BYLINE:** By **ERIC LIPTON**

**SECTION:** Section 1; Column 5; National Desk; Pg. 1

**LENGTH:** 2521 words

**DATELINE:** WASHINGTON, June 17

Dozens of members of the Bush administration's domestic security team, assembled after the 2001 terrorist attacks, are now collecting bigger paychecks in different roles: working on behalf of companies that sell domestic security products, many directly to the federal agencies the officials once helped run. At least 90 officials at the Department of **Homeland Security** or the White House Office of **Homeland Security** -- including the department's former secretary, Tom Ridge; the former deputy secretary, Adm. James M. Loy; and the former under secretary, Asa Hutchinson -- are executives, consultants or lobbyists for companies that collectively do billions of dollars' worth of domestic security business.More than two-thirds of the department's most senior executives in its first years have moved through the **revolving door.** That pattern raises questions for some former officials. "People have a right to make a living," said Clark Kent Ervin, the former inspector general of the department, who now works at the Aspen Institute, a nonpartisan public policy research center. "But working virtually immediately for a company that is bidding for work in an area where you were just setting the policy -- that is too close. It is almost incestuous." Federal law prohibits senior executive branch officials from lobbying former government colleagues or subordinates for at least a year after leaving public service. But by exploiting loopholes in the law -- including one provision drawn up by department executives to facilitate their entry into the business world -- it is often easy for former officials to do just that. Michael J. Petrucelli, for example, who was once acting director of citizenship and immigration services, moved within months of leaving his post in July 2005 to a job in which he lobbied the Coast Guard, another unit of the department, to test a power-supply device made by his new employer, GridPoint. Victor X. Cerda, within a few months of his 2005 departure as acting director of the agency that handles the detention of illegal immigrants, was hired by a company that is a top contractor for that agency. With Mr. Cerda's help, the company is now seeking millions of dollars in new agency business. In their new roles, former department officials often command salaries that dwarf their government paychecks. Carol A. DiBattiste, who made $155,000 in 2004 as deputy administrator at the Transportation Security Administration, earned more than $934,000 last year from ChoicePoint, a **Homeland Security** Department contractor she joined in April 2005, the same month she left the agency. Mr. Ridge, the former secretary, stands to profit handsomely now that Savi Technology, a maker of radio frequency identification equipment that the department pushed while he was

secretary, is being bought by Lockheed Martin. He was appointed to the Savi board three months after resigning from the department and has been compensated with an undisclosed number of stock options that Lockheed will presumably need to buy back. In the coming weeks, Mr. Ridge says he plans to open his own domestic security and crisis management consulting firm. The shift to the private sector is hardly without precedent in Washington, where generations of former administration officials have sought higher-paying jobs in industries they once regulated. But veteran Washington lobbyists and watchdog groups say the exodus of such a sizable share of an agency's senior management before the end of an administration has few modern parallels. "It is almost like an initial public offering in the stock market," Scott Amey, general counsel at the Project on Government Oversight, based in Washington, said of the booming domestic security market. "Everyone wants a piece of it."

Anatomy of a Transition

For two years, Mr. Hutchinson, a onetime United States congressman and a current candidate for Arkansas governor, served as under secretary for border and transportation security, supervising the 110,000 employees charged with guarding the nation's borders, ports and airports. His transition from public service to the for-profit world could serve as a primer for others. Mr. Hutchinson began his negotiations to enter private industry months before he resigned. On March 2, 2005, the day after he officially left the department, he began work at Venable LLP, a Washington law and lobbying firm that represents major domestic security contractors like Lockheed Martin. Federal law prohibits executive branch officials from negotiating for a future job with companies they oversee. Mr. Hutchinson complied with this provision by signing a waiver in December 2004, vowing to be "disqualified from participating personally in any particular matter that would have a direct and predictable effect on Venable." Benjamin R. Civiletti, the chairman of Venable, made clear why Mr. Hutchinson was attractive to the firm. "Asa was not only present at the creation of this vast new security infrastructure," Mr. Civiletti said when announcing Mr. Hutchinson's appointment as director of the firm's domestic security practice. "He was one of the chief architects and implementers." Mr. Hutchinson was soon representing clients including Intelligenxia, a data-mining software company seeking domestic security business; ImmuneRegen BioSciences, a pharmaceutical company that sells anti-radiation drugs; and Global Computer Enterprises, which wants to expand its computer software and systems sales to the department. Working with Mr. Hutchinson at Venable was Alison R. Williams, his special assistant at the **Homeland Security** Department, who was not senior enough at the agency to be subject to the one-year lobbying ban. Ms. Williams set up and attended a meeting between Global and Andrew B. Maner, then the department's chief financial officer, which Mr. Hutchinson did not attend. Mr. Maner was overseeing the introduction of a financial management system, and Global wanted a bigger piece of the job. "We wanted to educate **Homeland Security** officials," said David Lucas, director of government relations at Global. "We wanted our view heard." Mr. Hutchinson opened a second for-profit venture in Arkansas, his home state, starting a firm he called Hutchinson Security Strategies. Again, he enlisted a former department aide, Betty Anderson Guhman, who, like Ms. Williams, was not subject to the one-year lobbying ban. Ms. Guhman says she interacts regularly with **Homeland Security** Department officials on visits to Washington, as she did recently, meeting with W. Ralph Basham after his nomination as commissioner of customs and border protection. Mr. Hutchinson said the presence of his business partners at these meetings was not meant to circumvent the lobbying ban. "When I am not at a meeting," he said, "I am not at the meeting." Nine months after leaving the department, Mr. Hutchinson moderated a private briefing and reception in Washington for senior domestic security officials and industry representatives given by Saflink, a Bellevue, Wash., manufacturer of fingerprint and other identification technology. The event focused on two transportation security programs that Saflink intended to bid on and that Mr. Hutchinson, who had been named to Saflink's board, helped create at the department. Thanks to the participation by Mr. Hutchinson and others, the briefing achieved its goal of "solidifying Saflink's position as a leader in this area in the minds of key government decision makers," Glenn Argenbright, Saflink's chief executive, said in describing the event to industry analysts. Mr. Hutchinson said he was convinced that the session did not violate the lobbying ban. "A panel discussion forum is not lobbying by any standard whatsoever," he said. The biggest potential for profit among Mr. Hutchinson's ventures appears to come from his role as an

investor in Fortress America Acquisition, a domestic security investment firm for which he also acts as an adviser. The company raised $42 million last year by selling stock through an initial public offering. Mr. Hutchinson, before the stock was sold publicly, bought 200,000 shares for $25,000. At Friday's trading price the stock was worth more than $1.2 million. (He cannot sell those shares for at least two years.) Given the demands of running for office, Mr. Hutchinson chose not to renew a one-year contract with Venable in March. Calculating how much he earned through all these endeavors over the last year is difficult. His financial disclosure form filed in Arkansas in May as part of the governor's race says only that in 2005 he made more than $12,500 -- the maximum amount available to check off on the state disclosure form -- from at least four different domestic-security-related ventures, not including the department itself. Mr. Hutchinson acknowledges that in one year he earned more than he ever did in one year as under secretary at the **Homeland Security** Department, but he declined to give an estimate of his earnings. What troubles Mr. Amey of the Project on Government Oversight are not the lucrative paychecks earned by former officials like Mr. Hutchinson, but what he sees as an effort to disregard the spirit of the lobbying ban in pursuit of those rewards. ''It is a dirty way to get around the conflict-of-interest and ethics rules,'' Mr. Amey said. ''It is legal. But is it appropriate? I don't think so.''

Laws and Loopholes

The law that governs the so-called post-employment life for federal officials was enacted in 1962. It prohibits senior officials from ''any communication to or appearance'' before their former government department or agency on behalf of another for one year from the date they leave their job. There is also a lifetime ban on communicating with anyone at the department in connection with ''a particular matter'' in which the former official ''participated personally and substantially.'' A separate law prohibits certain former federal employees, like program managers or contracting officers, from accepting a job with a company they supervised for a year afterward if a contract involved exceeded $10 million. Robert E. Coyle, the designated ethics official for the **Homeland Security** Department, said he believed that former department executives were almost universally honoring the rules. ''We can argue about what the law should be,'' Mr. Coyle said, ''but let's not tar people with misconduct because they are doing something that is permissible under the law.'' Some former officials said the motivation to leave was not to cash in on their expertise but the sheer exhaustion they felt after setting up a new and often maligned agency. Others said they had unnecessarily arranged to work, for at least their first year outside government, on projects unrelated to department business. ''That was a precondition to the job,'' said Greg Rothwell, who stepped down this year as the agency's chief contracting officer and now works for Booz Allen Hamilton, which recently won a $250 million, five-year technology consulting contract from the department. But the experience in the short life of the agency shows that the law often does little to prevent former officials from moving quickly to lobby the government on domestic security matters on behalf of their new bosses or clients. Perhaps the biggest loophole was created in late 2004 at the request of senior department officials, when the first big wave of departures began. The Office of Government Ethics approved a request by the department to split it into seven components for the purposes of the ethics rules. Once in the private sector, most former department officials were prohibited for one year from lobbying the same component where they once worked. That meant that Mr. Petrucelli technically complied with the ethics rules even though he left the **Homeland Security** Department and within months started pitching GridPoint products to the Coast Guard. The reason: the Coast Guard is not part of the component that contained Mr. Petrucelli's former agency, Citizenship and Immigration Services.

Within Bounds

Tom Blank's swift move into the private sector was made possible by a different loophole. Mr. Blank became vice chairman of the lobbying firm Wexler & Walker Public Policy Associates just two weeks after leaving the Transportation Security Administration in September 2005, where he had been the No. 2 official. Mr. Blank set up a new practice within the lobbying firm representing an association of contractors including Lockheed Martin and General Electric that planned to bid on an airport checkpoint security program he had helped create while with the agency. In his new role, Mr. Blank also helped draft proposed technical standards for the checkpoint program that were submitted to his former subordinates at the security administration. Mr. Blank pointed out that

ethics rules allowed former officials to work behind the scenes in many areas where they were previously involved. He said he honored the one-year lobbying prohibition by having another partner at Wexler & Walker sign the document turned in to the **Homeland** Security Department. For Mr. Cerda, the former acting director of immigrant detention operations, the saving grace was his relatively modest salary at the department. He left his government post in July 2005 to join a law firm specializing in immigration. One of his first lobbying clients was the Geo Group, which sells detention center bed space to his former agency. One Geo Group subsidiary had won a contract to operate a 1,000-bed detention complex in Texas while Mr. Cerda helped run the agency. In his new role, he is helping Geo prepare to bid on more contracts, and he has directly represented Geo before the department, attending a meeting with Geo executives at his old agency, even though he has been gone less than a year. He can do this without violating the lobbying rules because he did not earn enough at the **Homeland Security** Department to be covered by the ban. According to federal records, Mr. Cerda earned $135,000 at the department in 2005, about $5,000 below the cutoff salary. Steve Parsons's quick transition into the private sector appears to be possible because of another financial exemption. As a deputy program manager for the Transportation Security Administration, Mr. Parsons helped run an office that created identification cards for port workers. He quit last year to work as a sales manager for Senture, a small Kentucky subcontractor of the program. Under ethics law, someone with Mr. Parsons's title cannot work for a subcontractor until after a year. But there is a loophole: Senture's subcontract was under the law's $10 million cap.

**Homeland Security** Inc.
This two-part series examines how former domestic security officials have benefited from their connections to the federal agencies they once helped supervise. Tomorrow: how an expert's advocacy influenced Congress. A more complete list of former government officials and where they have gone: nytimes.com/washington

**URL:** http://www.nytimes.com

**Find Documents with Similar Topics**

**EXHIBIT B**

7 of 9 DOCUMENTS

# ST. PAUL PIONEER PRESS

Found on TwinCities ● com

Saint Paul Pioneer Press (Minnesota)

June 18, 2006 Sunday

# Dozens of federal counterterrorism employees have left for private-sector jobs dealing with their former agencies

**SECTION:** MAIN; Pg. 9A

**LENGTH:** 1782 words

'It is almost like an initial public offering in the stock market. Everyone wants a piece of it.' Scott Amey, of Project on Government Oversight, on the domestic-security market

**Security officials land big pay as lobbyists**

**Dozens of federal counterterrorism employees have left for private-sector jobs dealing with their former agencies**

**BY ERIC LIPTON**

**New York Times**

WASHINGTON -- Dozens of members of the Bush administration's domestic-security team, assembled after the 2001 terrorist attacks, are now collecting bigger paychecks in different roles: working on behalf of companies that sell domestic-security products, many directly to the federal agencies the officials once helped run.

At least 90 officials at the Department of Homeland Security or the White House Office of Homeland Security -- including the department's former secretary, Tom Ridge; the former deputy secretary, Adm. James Loy; and the former undersecretary, Asa Hutchinson -- are executives, consultants or lobbyists for companies that collectively do billions of dollars' worth of domestic-security business.

More than two-thirds of the department's most senior executives in its first years have moved through the revolving door. That pattern raises questions for some former officials.

"People have a right to make a living," said Clark Kent Ervin, the former inspector general of the department, who now works at the Aspen Institute, a nonpartisan public policy research center. "But working virtually immediately for a company that is bidding for work in an area where you were just setting the policy

-- that is too close. It is almost incestuous."

   Federal law prohibits senior executive branch officials from lobbying former government colleagues or subordinates for at least a year after leaving public service. But by exploiting loopholes in the law -- including one provision drawn up by department executives to facilitate their entry into the business world -- it is often easy for former officials to do just that.

## NEW ROLES, BIGGER CHECKS

   Michael Petrucelli, for example, who was once acting director of citizenship and immigration services, moved within months of leaving his post in July 2005 to a job in which he lobbied the Coast Guard, another unit of the department, to test a power-supply device made by his new employer, GridPoint.

   Victor Cerda, within a few months of his 2005 departure as acting director of the agency that handles the detention of illegal immigrants, was hired by a company that is a top contractor for that agency. With Cerda's help, the company is now seeking millions of dollars in new agency business.

   In their new roles, former department officials often command salaries that dwarf their government paychecks. Carol DiBattiste, who made $155,000 in 2004 as deputy administrator at the Transportation Security Administration, earned more than $934,000 last year from ChoicePoint, a Homeland Security Department contractor she joined in April 2005, the same month she left the agency.

   Ridge, the former secretary, stands to profit handsomely now that Savi Technology, a maker of radio frequency identification equipment that the department pushed while he was secretary, is being bought by Lockheed Martin. He was appointed to the Savi board three months after resigning from the department and has been compensated with an undisclosed number of stock options that Lockheed will presumably need to buy back. In the coming weeks, Ridge says, he plans to open his own domestic-security and crisis-management consulting firm.

   The shift to the private sector is hardly without precedent in Washington, where generations of former administration officials have sought higher-paying jobs in industries they once regulated. But veteran Washington lobbyists and watchdog groups say the exodus of such a sizable share of an agency's senior management before the end of an administration has few modern parallels.

   "It is almost like an initial public offering in the stock market," Scott Amey, general counsel at the Project on Government Oversight, based in Washington, said of the booming domestic-security market. "Everyone wants a piece of it."

## ANATOMY OF A TRANSITION

   For two years, Hutchinson, a former U.S. senator and a current candidate for Arkansas governor, served as undersecretary for border and transportation security, supervising the 110,000 employees charged with guarding the nation's borders, ports and airports. His transition from public service to the for-profit world could serve as a primer for others.

   Hutchinson began his negotiations to enter private industry months before he resigned. On March 2, 2005, the day after he officially left the department, he began work at Venable LLP, a Washington law and lobbying firm that represents major domestic-security contractors like Lockheed Martin.

   Federal law prohibits executive branch officials from negotiating for a future

job with companies they oversee. Hutchinson complied with this provision by signing a waiver in December 2004, vowing to be "disqualified from participating personally in any particular matter that would have a direct and predictable effect on Venable."

Benjamin Civiletti, the chairman of Venable, made clear why Hutchinson was attractive to the firm.

"Asa was not only present at the creation of this vast new security infrastructure," Civiletti said when announcing Hutchinson's appointment as director of the firm's domestic-security practice. "He was one of the chief architects and implementers."

Hutchinson was soon representing clients including Intelligenxia, a data-mining software company seeking domestic-security business; ImmuneRegen BioSciences, a pharmaceutical company that sells anti-radiation drugs; and Global Computer Enterprises, which wants to expand its computer software and systems sales to the department.

Working with Hutchinson at Venable was Alison Williams, his special assistant at the Homeland Security Department, who was not senior enough at the agency to be subject to the one-year lobbying ban. Williams set up and attended a meeting between Global and Andrew Maner, then the department's chief financial officer, which Hutchinson did not attend. Maner was overseeing the introduction of a financial-management system, and Global wanted a bigger piece of the job.

"We wanted to educate Homeland Security officials," said David Lucas, director of government relations at Global. "We wanted our view heard."

**'IT'S NOT LOBBYING'**

Hutchinson opened a second for-profit venture in Arkansas, his home state, starting a firm he called Hutchinson Security Strategies. Again, he enlisted a former department aide, Betty Anderson Guhman, who, like Williams, was not subject to the one-year lobbying ban.

Guhman says she interacts regularly with Homeland Security officials on visits to Washington, as she did recently, meeting with W. Ralph Basham after his nomination as commissioner of customs and border protection.

Hutchinson said the presence of his business partners at these meetings was not meant to circumvent the lobbying ban. "When I am not at a meeting," he said, "I am not at the meeting."

Nine months after leaving the department, Hutchinson moderated a private briefing and reception in Washington for senior domestic-security officials and industry representatives given by Saflink, a Bellevue, Wash., manufacturer of fingerprint and other identification technology. The event focused on two transportation security programs that Saflink intended to bid on and that Hutchinson, who had been named to Saflink's board, helped create at the department.

Thanks to the participation by Hutchinson and others, the briefing achieved its goal of "solidifying Saflink's position as a leader in this area in the minds of key government decision makers," Glenn Argenbright, Saflink's chief executive, said in describing the event to industry analysts.

Hutchinson said he was convinced that the session did not violate the lobbying ban. "A panel discussion forum is not lobbying by any standard whatsoever," he said.

The biggest potential for profit among Hutchinson's ventures appears to come from his role as an investor in Fortress America Acquisition, a domestic-security investment firm for which he also acts as an adviser. The company raised $42 million last year by selling stock through an initial public offering. Hutchinson, before the stock was sold publicly, bought 200,000 shares for $25,000. At Friday's trading price the stock was worth more than $1.2 million. (He cannot sell those shares for at least two years.)

Given the demands of running for office, Hutchinson chose not to renew a one-year contract with Venable in March. Calculating how much he earned through all these endeavors over the past year is difficult. His financial disclosure form filed in Arkansas in May as part of the governor's race says only that in 2005 he made more than $12,500 -- the maximum amount available to check off on the state disclosure form -- from at least four different domestic-security-related ventures, not including the department itself.

Hutchinson acknowledges that in one year he earned more than he ever did in one year as undersecretary at the Homeland Security Department, but he declined to give an estimate of his earnings.

**LEGAL, BUT IS IT ETHICAL?**

What troubles Amey of the Project on Government Oversight are not the lucrative paychecks earned by former officials like Hutchinson, but what he sees as an effort to disregard the spirit of the lobbying ban in pursuit of those rewards.

"It is a dirty way to get around the conflict-of-interest and ethics rules," Amey said. "It is legal. But is it appropriate? I don't think so."

The law that governs the so-called post-employment life for federal officials was enacted in 1962. It prohibits senior officials from "any communication to or appearance" before their former government department or agency on behalf of another for one year from the date they leave their job. There is also a lifetime ban on communicating with anyone at the department in connection with "a particular matter" in which the former official "participated personally and substantially."

A separate law prohibits certain former federal employees, like program managers or contracting officers, from accepting a job with a company they supervised for a year afterward if a contract involved exceeded $10 million.

Robert Coyle, the designated ethics official for the Homeland Security Department, said he believed that former department executives were almost universally honoring the rules. "We can argue about what the law should be," Coyle said, "but let's not tar people with misconduct because they are doing something that is permissible under the law."

**LOAD-DATE:** June 18, 2006

**LANGUAGE:** ENGLISH

**PUBLICATION-TYPE:** Newspaper

Copyright 2006 Saint Paul Pioneer Press
All Rights Reserved

**EXHIBIT C**

9 of 9 DOCUMENTS

The American Prospect

January, 2006

# Security for Sale;
# The Department of Homeland Security has a section on its Web site labeled "Open for Business." It certainly is.

**BYLINE:** BY SARAH POSNER; Sarah Posner is a freelance writer and a contributor to The Gadflyer blog.

**SECTION:** FEATURES; Pg. 28

**LENGTH:** 5146 words

AMID THE POLITICAL AND CULTURAL UPHEAVAL that followed the September 11 terror attacks, Americans were warned repeatedly that everything would be different because a vulnerable nation could no longer afford to remain complacent, careless, and profligate. Politicians of both parties vowed discipline, self-sacrifice, and diligence. Perhaps the most ostentatious symbol of this shared national commitment was the creation of the new Department of Homeland Security (DHS) in 2003.

Less than three years later, the brief but uninspiring history of DHS proves how little has actually changed in Washington, where the institutional cultivation of influence peddling, cronyism, and waste continues to thrive unimpeded. At the bureaucracy that is supposed to protect us, Republican lobbyists bustle through the revolving door, carrying millions in contracts for their corporate clients, with all the predictable failures and cost overruns; Congressional committee chairmen collect their campaign conributions from contractors and lobbying firms, just like their counterparts on the defense committees; and even the son-in-law of the vice president benefits from a patronage appointment that leaves him overseeing his former lobbying clients.

Some of the country's largest government contractors, already fat on Pentagon pork, have retained well-connected lobbyists to win their slice of the DHS budget. Lobbyists who double as Bush Rangers and Pioneers, raising hundreds of thousands of campaign dollars, now represent some of the biggest DHS contractors. These lobbyists and their clients -- through both individual donations and those of their political action committees -- have poured still more hundreds of thousands into the campaigns and PACs of powerful Republican members of Congress who control DHS appropriations and oversight.

In the age of terror and natural catastrophe, knowing the right people is still the right way to get rich.

The Department of Homeland Security Web site includes a section -- titled "Open for Business" -- that is designed to assist companies seeking to win part of the $ 10 billion in procurement contracts doled out annually to enhance our security. The

array of goods and services needed to protect the homeland ranges from detection equipment for explosive, radioactive, biological, and chemical agents to private security guards, surveillance, computer and telecommunications equipment, as well as port, border, railroad, and aviation security, and the management of immigration detention centers. Yet while the Bush administration has promised that good government and good old American ingenuity will yield world-class innovations, the product has been considerably less than advertised. The newest bureaucracy is not only open for business, it is wide open for business as usual. This is nothing new or different, but the same old way that Washington has worked for many, many years. The difference is in the stakes: While the politicians, contractors, and lobbyists pursue their familiar agendas, what is the cost to our safety?

The corporate exploitation of the new department became inevitable even before it was founded, during the first dark days after 9-11, when Tom Ridge was appointed to direct the White House Office of Homeland Security. With the former Pennsylvania governor came three aides who had no apparent experience in the field of homeland security but a keen understanding of the business of politics. Mark Holman, who was appointed deputy assistant to the president in the Office of Homeland Security, had been Ridge's chief of staff for 18 years, both in Congress and later in the Pennsylvania statehouse. Ashley Davis, a former lobbyist who had worked on Ridge's gubernatorial campaigns, the Bush-Cheney campaign, the Florida recount, and the Republican National Convention in 2000, became Ridge's special assistant. Joining them was Carl Buchholtz, the former general counsel to Ridge's gubernatorial campaigns and a partner in the Philadelphia-based law and lobbying firm Blank Rome LLP, who took a year away from the firm to help the White House plan the DHS. Blank Rome's chairman, David Girard-diCarlo, a former Ridge fundraiser and Bush Pioneer in 2000, is among Ridge's closest friends.

By the time DHS opened its doors in 2003, Buchholtz had returned to Blank Rome, taking Holman and Davis with him. All three quickly turned to lobbying the department whose creation they had helped to oversee. When Blank Rome signed up 18 companies as new homeland security clients that year, and added homeland security to its lobbying duties for half a dozen existing clients, no ethics rules barred Buchholtz, Holman, and Davis from lobbying the new department -- because technically, none of them had worked there. Blank Rome had just merged with Dyer Ellis & Joseph, a firm that employed several former Capitol Hill aides with ties to influential members of Congress and expertise in maritime and transportation issues -- important knowledge because DHS had absorbed the Coast Guard and the Transportation Security Administration (TSA), which are now the top dispensers of procurement dollars in the DHS.

The Philadelphia-based law firm formally launched a separate lobbying arm in Washington, Blank Rome Government Relations, which included the three former White House staffers and the Dyer Ellis principals. Later that year, the firm also brought on Barbara Comstock, a former congressional staffer who had served as the chief spokesperson for then-Attorney General John Ashcroft -- after becoming notorious as the head of the opposition research team at the Republican National Committee (RNC) in 2000; *The Washington Post* dubbed her a "one-woman wrecking crew." Since joining Blank Rome, Comstock also has led a public relations campaign on behalf of Tom DeLay and is spokeswoman for former Cheney aide I. Lewis "Scooter" Libby's legal defense fund.

While Blank Rome includes Democrats in its lobbying phalanx, Republicans dominate in terms of stature and fund-raising clout. Last year Girard-diCarlo moved up from Pioneer to Ranger status (meaning he had doubled the amount he raised for the Bush-Cheney campaign to $ 200,000), while both Holman and Buchholtz became Pioneers. Blank Rome employees were the seventh most generous contributors to the

RNC in 2004, pouring in $ 345,000, which included contributions by Girard-diCarlo ($ 50,000), Buchholtz ($ 12,500), and partner David Norcross ($ 37,500), who was named to chair the arrangements committee at 2004's Republican National Convention in New York City.

Among the new lobbying clients acquired by Blank Rome were such giants as Boeing, already among the top 10 government contractors in annual revenue, and management consultant BearingPoint, which is among the top 50 contractors. Formerly known as KPMG Consulting, BearingPoint was no stranger to Ridge. When Ridge was governor of Pennsylvania, the state had used BearingPoint's software to track criminal offenders.

In 2004, after signing on with Blank Rome, the company won three major DHS deals: a $ 229 million contract for its "eMerge2" software, designed to integrate the financial management of the department's 22 component agencies; a $ 12 million contract to develop a Transportation Worker Identification Credential (TWIC) to improve security at seaports, airports, railroads, pipelines, and mass transit facilities with biometric credentialing; and an up to five-year, $ 30 million contract to study development of an integrated terrorist screening system for the Terrorist Screening Center, in partnership with a small business through the department's mentor-protege program. (The mentor-protege program benefits large companies that piggyback on the procurement advantages offered to small and minority businesses. In another familiar pattern, BearingPoint's partner on the Terrorist Threat Integration Center project is a small, minority-owned firm whose principals formerly worked at KPMG.)

While BearingPoint was landing those lucrative government contracts, the company was ladling out money to Republican causes. During the 2004 election cycle, BearingPoint's PAC donated almost $ 40,000 to federal candidates, of which more than 80 percent went to Republicans -- including $ 5,000 contributions to both Jerry Lewis, chair of the House Appropriations Committee, and Thad Cochran, chair of the Senate Appropriations Committee. In late 2003, the company's PAC paid $ 15,000 for membership in the RNC Majority Fund, described on the RNC's Web site as a "leadership group supporting President Bush, his bold agenda for America, and Republican members of the U.S. House and Senate."

Within a year, the TWIC and eMerge2 contracts were drawing skeptical scrutiny. TWIC's costs had more than doubled to $ 24 million, provoking Republican Senator Susan Collins, chair of the Senate Homeland Security and Government Affairs Committee, to ask the Government Accountability Office (GAO) to investigate. Last summer, the eMerge2 program was put on hold, after DHS had spent $ 10 million on it. Trade magazines reported that by November 2004 the Coast Guard already had developed its own financial management system that potentially could be used department-wide, an effort that cost a tiny fraction of the $ 229 million budgeted for eMerge2.

As for Boeing -- a top government contractor and political contributor with a history of overcharging the Pentagon -- the aviation and defense behemoth won a $ 1.2 billion contract in 2002 from the TSA to install baggage-screening equipment in hundreds of airports. In 2004, DHS Inspector General Clark Kent Ervin found that Boeing had won that contract despite being the highest rather than the lowest bidder, and had been overpaid $ 49 million by the government.

Meanwhile, Blank Rome's Mark Holman had registered as Boeing's homeland security lobbyist. On the registration form he filed with the Senate clerk, Holman noted that his lobbying work would address "strategic coordination between TSA and DHS."

In late 2003, after his former aides had taken Boeing as a client, Ridge appointed Rick Stephens, a Boeing senior vice president, to the Private Sector

Senior Advisory Committee of the Homeland Security Advisory Council. With a
membership of business executives, the Advisory Committee is "plotting the future of
the agency five, 10, 15, 20 years down the line," according to Scott Amey of the
nonpartisan watchdog Project on Government Oversight; Amey believes that those
serving on the committee will learn about the department's inner workings, obtaining
a considerable advantage for their companies. So while his former aide's client was
overbilling the DHS, Ridge was rewarding the company by giving one of its executives
a plum advisory appointment.

In September 2004, Ervin urged the TSA to attempt to recoup the $ 49 million in
overpayment to Boeing, but the agency rejected the inspector general's admonition.
Instead, the TSA extended Boeing's contract through the end of the calendar year.

Ridge himself appears to have benefited from one of his Private Sector Advisory
Committee appointments. He appointed an executive of Exelon, the nation's largest
private owner of nuclear power plants, to the committee. (The company was already
quite cozy by then with the homeland security politicos. While Mark Holman was
working at the Office of Homeland Security, his wife, Sonia Holman, a lobbyist at
the American Continental Group, had lobbied the office on behalf of Exelon, a job
she continued after the department was formed.) After Ridge retired, Exelon
reciprocated by appointing him to the company's board of directors.

Speaking on behalf of Blank Rome Government Relations, Topper Ray, a firm
principal, said that the former Office of Homeland Security staffers at the firm
"have adhered to all applicable government regulations on communications and
representation that govern post-employment activity." Ray dismissed suggestions that
they may have received preferential treatment from Ridge or his staff, adding that
all DHS contracts the firm's clients received were competitively bid, and that
"everything is out in the open." He added, "These are people of the highest
integrity. They understand their responsibilities."

Another eager client signed up by former Ridge staffers at Blank Rome was the
Homeland Security Corporation (HSC), a company started in 2001 by a Tennessee
businessman named Doctor R. Crants. The politically connected Crants had once headed
the country's largest privatized prison firm, Corrections Corporation of America
(CCA), which he established in 1983 with a former chair of the Tennessee Republican
Party and modeled on the Frist family's Hospital Corporation of America, creating an
industry based on incarceration-for-profit.

With his new company, Crants appears to be capitalizing on his 17-year tenure at
CCA -- during which the company nearly fell into bankruptcy and became the target of
lawsuits alleging gross mismanagement of the privatized prisons, and that violence,
drug dealing, and mistreatment of inmates were commonplace. Through a $ 100 million
contract with defense giant Lockheed Martin, HSC now trains thousands of security
screeners at the nation's airports.

Today CCA, HSC, and CCA's closest competitor in the private prison industry,
Wackenhut -- brandishing lobbyists, political connections, and lavish contributions
-- have all won DHS contracts to train and supply security guards and screeners and
to build, manage, and maintain detention facilities. Wackenhut and CCA both have
long histories of questionable practices, ranging from general incompetence in
managing government facilities to allegations of putting prisoners and the public at
risk. That these firms have been hired by DHS to keep the nation safe, and are
profiting handsomely from it, attests to political influence dating back two
decades.

Crants, CCA, and Wackenhut were no strangers to Ridge when he assumed his
homeland security responsibilities. Nor were they unfamiliar with big money GOP

politics or the ideological infrastructure created by "free-market" conservatives to
promote industry-friendly legislation. Back when Ridge was governor of Pennsylvania,
both CCA (under Crants' leadership) and Wackenhut supported the American Legislative
Exchange Council (ALEC), an organization started in 1973 with the goal to push a
right-wing, corporate-dominated agenda through state legislatures. During Ridge's
tenure -- when Mark Holman was his chief of staff -- Pennsylvania passed
comprehensive "tough on crime" legislation that had been drafted by ALEC's Criminal
Justice Task Force, on which both CCA and Wackenhut served. The state, under Ridge,
was "a pilot state, almost, for ALEC's three strikes, tough on crime, its whole
platform," said Ed Bender of the Institute for Money in State Politics. By paying a
required fee to serve on ALEC's task force, CCA "bought a seat at the table," said
Bender.

Once Ridge became homeland security secretary in January 2003, he appointed
(former) ALEC chairman, Republican Senator Jim Dunlap of Oklahoma, to the Homeland
Security Advisory Council, a group of state officials designated to advise the
department. Dunlap still serves on ALEC's board.

The same year, after they left the White House for Blank Rome, Davis and Holman
signed up Crants' new company, HSC, as a lobbying client. For his part, Crants has
remained a generous GOP benefactor; last year, for example, he gave $ 25,000 to the
National Republican Senatorial Committee and $ 1,000 to Swift Boat Veterans for
Truth. CCA's PAC continues to support Republican candidates, and its 2004 political
donations included $ 30,000 to the National Republican Senatorial Committee and $
30,000 to the National Republican Congressional Committee.

CCA also continues to rake in federal dollars from the Department of Homeland
Security and other agencies. More than 20 years after CCA landed its first federal
contract with the Immigration and Naturalization Service, federal contracts account
for one-third of its revenue. CCA has several multi-year contracts for guard
services with the DHS successor to the INS, Immigration and Customs Enforcement, but
neither CCA nor ICE would provide the dollar amount of the contracts. The
government's contract database, which contained some of the contracts identified by
CCA and others it did not identify, reflected a dollar value of more than $ 2
billion, if all options were exercised.

No doubt CCA's standing at DHS is enhanced by the fact that one of the firm's
former lobbyists is not only Dick Cheney's son-in-law, but the department's general
counsel. The political appointments awarded by President Bush to Philip J. Perry,
who happens to be married to Cheney's daughter Elizabeth, have included jobs at the
Department of Justice and the Office of Management and Budget. In 2003 Perry
returned to his private law and lobbying practice with Latham & Watkins' government
contracts group, only to be appointed in 2005 to the DHS post.

Perry's conduct "violates every principle the revolving door policy is supposed
to [uphold]," says Public Citizen's Craig Holman (no relation to Mark Holman), who
adds that Perry was "nurturing relationships on both sides" as he worked in
government, returned to private practice, and revolved back into government again in
"absolutely egregious abuse" of ethics standards. Not only did Perry lobby on behalf
of CCA, he also was a lobbyist for Pentagon and DHS giant Lockheed Martin, which has
the subcontract with Crants' HSC to train the airport security screeners. Perry's
office did not return calls from the Prospect seeking his comments.

Wackenhut, part of which was acquired in 2002 by Danish company Group 4 Falck
(now Group 4 Securicor) and part of which recently was renamed the Geo Group, has
likewise prospered at DHS. The Geo Group, whose CEO George Zoley was a Bush Pioneer
in 2004, has obtained numerous contracts with Immigration and Customs Enforcement to
construct, maintain, and manage detention facilities over the next few decades. This

year, Geo Group paid Blank Rome's Barbara Comstock $ 40,000 over a three-month
period to lobby DHS to "maintain government contracts," according to her lobbying
disclosure statement. Geo has also Alberto Cardenas, the former chair of the Florida
Republican Party and a Bush Pioneer, in its stable of lobbyists.

One of Cardenas' partners, Victor Cerda, left DHS last summer after serving in
several posts, most recently as acting director of the Office of Detention and
Removal Operations at the immigration service. Asked how he complied with federal
rules that bar lobbyists from contacting their former agencies for one year, Cerda
replied that the has received clearance from the ICE ethics office for specific
"scenarios" regarding his work for Geo. He said that he does not lobby on Geo's
behalf regarding contracts over which he had decision-making authority at DHS, but
that he instead provides advice "on DHS operational strategies."

Wackenhut has a contract potentially valued at $ 500 million to provide guards
to the Bureau of Customs and Border Protection. Its lobbying firm is Van Scoyoc
Associates, whose vice president, Ray Cole, was a Bush Ranger last year. DHS
continues to contract with Wackenhut, despite evidence that the company has failed
to protect power plants and military bases. In 2003, the Department of Energy's
inspector general found that Wackenhut, responsible for guarding half of the
nation's nuclear power plants, had not provided adequate security at the Oak Ridge
nuclear weapons plant in Tennessee. At the same time, under an unprecedented plan
passed by Congress in 2002, the company became one of the first private contractors
hired by the Pentagon to guard military bases.

Today Wackenhut, along with a partner called Alutiiq Management, has contracts
to guard 18 Army facilities around the country. Those deals have come under fire
from the Service Employees International Union (SEIU), which published a report last
September, *Homeland Insecurity: How Wackenhut and an Alaska Native Corporation May
Be Compromising Security at U.S. Army Bases*, documenting numerous flagrant breaches
of security including the hiring of convicted felons; understaffing of facilities;
inadequate training; poor weapons management, including weapons left unattended,
rusty guns, and faulty bullets; and failure to properly use adequate equipment such
as explosive detection devices, radios, body armor, and even bathrooms. Democratic
Representative Lane Evans, a member of the House Armed Services Committee, has asked
the GAO to investigate Wackenhut's defense contracts.

Wackenhut entered into partnership with Alutiiq because the smaller firm -- an
Alaska Native Corporation, or ANC -- is legally entitled to government contracts
without having to bid on them. Alutiiq was in bankruptcy a few years ago, but the
company is now flush with cash thanks to government largesse, including contracts
with DHS agencies such as the Coast Guard, to repair buildings and to manage
operations and maintenance of the world's largest Coast Guard base on Kodiak Island
in Alaska; the Federal Law Enforcement Training Center, to build prefabricated and
portable buildings; and the Bureau of Citizenship and Immigration Services, to
provide administrative, logistics, assessments, investigations, and security
support.

Alutiiq's lobbyist happens to be C.J. Zane, one of the Dyer Ellis principals who
joined Blank Rome after the merger in 2003. In 2002, Zane had lobbied, on behalf of
Alutiiq, for the change in federal law that allowed privatization of security
services for military bases on U.S. soil.

Before he became a lobbyist, Zane had been chief of staff to Alaska's sole
representative in the House, Don Young, who is now the powerful chair of the House
Transportation Committee and the ranking Republican on the House Homeland Security
Committee. Zane's lobbying roster included numerous clients with maritime and

transportation interests, and several of the 13 legally recognized ANCs. ANCs have extraordinary advantages, giving them a competitive edge far beyond that given to other minority and economically disadvantaged firms. They can be awarded federal contracts of any value and duration on a sole-source basis, meaning not open to competition. They can create joint ventures and partnerships with other companies and be eligible for the sole-source advantages, if the ANC, on paper at least, has a majority of equity and managerial control over the venture.

The competitive advantage gained by some of the country's richest homeland security and defense contractors by partnering with ANCs is no secret. Press accounts have detailed billions of dollars in contracts awarded on a sole-source basis to ANCs (some of which would have lacked the expertise to fulfill contract requirements without a bigger corporate partner) for security guards, information and border security technology, airport screening, construction, and telecommunications. Akima, another ANC represented by Blank Rome, was the beneficiary of one of the well-publicized no-bid contracts awarded by DHS after Hurricane Katrina to construct portable classrooms worth almost $ 40 million, a price tag that the GAO is reviewing as possibly inflated.

The ANC contracting edge provoked Republican Representative Tom Davis, who chairs the House Government Reform Committee, to wonder aloud to *The Washington Post* last spring whether those advantages might be a "scam" on taxpayers. His committee is investigating the ANCs, and he has also requested a GAO probe.

The central goal of the ANCs -- to provide opportunities to native Alaskans who lost land due to the building of the Alaska pipeline -- is certainly laudable. Questions persist, however, about whether the program is actually functioning as intended. Danielle Brian, executive director of the Project on Government Oversight, says the program is "exploiting" native Alaskans because only "tiny amounts" from the huge profits in government contracts trickle down to the intended beneficiaries of the program. The CEO of Alutiiq, Dusty Kaser, received a $ 1 million compensation package in 2004, according to the SEIU report, 10 times the amount the company donated in scholarships to tribe members. *Government Executive,* a trade magazine, reported recently that a survey by the Native American Contracting Association of all 13 ANCs revealed that shareholders received an average of $ 283 a year. Zane and his colleagues are banking a bit more than that. According to its lobbying disclosure statements, Blank Rome earned about $ 300,000 in fees from its ANC clients alone in 2004.

Between 2002 and 2003, the year DHS opened its doors, Blank Rome's lobbying fees almost quadrupled, from $ 1.1 million to more than $ 4 million. More than one-quarter of those revenues were attributable to clients on whose behalf the firm contacted DHS. In 2004, the firm doubled its 2003 revenues from DHS clients to reach more than $ 2.5 million. The firm pulled in more than $ 1 million in fees from its DHS clients in the first half of 2005.

Blank Rome's meteoric rise in billable lobbying hours may well be extraordinary, but it is hardly the only politically influential outfit with high-rolling homeland security clients. Playing the same game is longtime Republican strategist and Bush Pioneer Charles Black, who has been cashing in on his GOP connections since his first lobbying partnership with the late Lee Atwater two decades ago. Through his lobbying firm, BKSH & Associates (a division of the public relations firm Burson-Marsteller), Black represents Fluor Corporation, an engineering and construction firm that is one of the top contractors for post-war reconstruction in Iraq. (He also used to represent Ahmed Chalabi and the Iraqi National Congress.) Last November, Fluor agreed to pay the government $ 12.5 million to settle a whistleblower suit alleging that the company had knowingly overbilled the

Departments of Defense and Energy on contracts for tens of millions of dollars of
illegal costs, including executive bonuses, land investments, construction and
building improvements, luxury condos, fine art, a Mercedes driven by the company's
president, and an antique Chippendale chair. However, Fluor had already been awarded
one of several $ 100 million no-bid contracts by FEMA to construct temporary housing
in the wake of Hurricane Katrina. Although the acting head of FEMA, David Paulison,
promised those highly questionable deals would be re-bid, that has yet to happen.

Another BKSH client is Accenture, which, as an offshore company headquartered in
Bermuda, avoids paying U.S. corporate income tax. Accenture is the prime contractor
on the $ 10 billion US-VISIT program, which is supposed to track foreigners entering
and exiting the country's borders, using digital photographs and fingerprints; the
use of other biometric data in the program is under study. Before the contract was
awarded, technology experts criticized the proposed technologies as unproven and
costly, and congressional Democrats attempted to kill it with an amendment that
would have prohibited the DHS from contracting with a company headquartered
offshore. (Such a measure subsequently became law, but it does not apply
retroactively.) Even after the contract was awarded, government watchdogs criticized
the leeway Accenture was given in shaping the contract requirements, leading
Taxpayers for Common Sense, a nonpartisan group, to liken it to a "blank check."
Black's lobbying disclosures show he specifically lobbied on Accenture's behalf on
US-VISIT and DHS appropriations, as well as tax issues pertaining to offshore
companies.

All of this legalized grifting was predictable -- and was, in fact, officially
predicted. Clark Kent Ervin, who served until the end of 2004 as DHS inspector
general, told the Prospect that in March 2003, he sent a memo to then-Secretary
Ridge warning of the need to put procurement controls in place to avoid contracting
waste and abuse. The memo never made it past the undersecretary for management
because, Ervin said, she knew that the controls weren't in place and she didn't want
Ridge to know they weren't. Ervin then sent a copy directly to Ridge, but never
received a response. "Subsequent developments," says Ervin, referring to reports of
millions of dollars in contracting waste and abuse, "were predictable."

The controls recommended by Ervin included hiring more procurement staff with
deeper experience. The DHS procurement office, he said, had "so few people expert in
contract procurement, the private sector was able to take the department for a
ride." Referring specifically to contracting abuses at TSA, Ervin added that there
was a "loose attitude regarding money."

Ervin's office did not investigate the role of lobbyists or political money in
the procurement process. His opinion now is that the procurement process has
improved, but he regards the "troubling" post-Katrina no-bid contracts let by FEMA
as a "step backward." While he praised Greg Rothwell, the department's chief
procurement officer, he warns that structural problems in DHS have stymied real
reform because each agency within the department has its own independent procurement
chief. This setup is inefficient, according to Ervin, and can "lead to abuse." Ridge
refused to reform the procurement process, and thus far his successor as secretary,
Michael Chertoff, has not made those changes either.

"Ridge is so nice he didn't want to alienate people," explains Ervin, while his
successor "is not afraid to knock heads" -- so the former inspector general is
"surprised and disappointed" that the new secretary has yet to change practices that
have proved vulnerable to abuse.

Indeed, Chertoff has shown little enthusiasm for transparency, even concerning
problems that predated his arrival. When he appeared at a hearing of the House
Committee on Government Reform last June, Democratic Representative Henry Waxman

complained that his requests for basic information about the contracts awarded to Blank Rome's clients by DHS had been ignored for five months. Although Chertoff publicly promised that the department would release the documents requested by Waxman, the congressman's office said that as of December, DHS had still not fully responded, and had redacted portions of the Blank Rome documents provided to his investigators.

Secrecy allows abuses to flourish -- and despite the ongoing uproar over crooked lobbying and corrupt contracting, that remains business as usual in the Bush administration.

**LOAD-DATE:** December 27, 2005

**LANGUAGE:** ENGLISH

**GRAPHIC:** Picture, no caption, REUBEN DALKE

Copyright 2006 The American Prospect, Inc.

# EXHIBIT D

1 of 3 DOCUMENTS


Pittsburgh Post-Gazette (Pennsylvania)

December 31, 2006 Sunday
TWO STAR EDITION

# RIDGE LANDS FIRST BIG CLIENT -- ALBANIA; EX-GOVERNOR LAUNCHES INTERNATIONAL CONSULTING BUSINESS

**BYLINE:** Steve Goldstein, Philadelphia Inquirer

**SECTION:** NATIONAL; Pg. B-4

**LENGTH:** 678 words


After nearly a quarter-century in public service, former Pennsylvania Gov. Tom Ridge was contemplating ... more public service.

The phone number of his new office seemed a dead giveaway, seven digits ending in 2008.

But Mr. Ridge, disappointing many advisers, has decided the time is not right for a run at the White House.

"I'm just not prepared to make the sacrifices necessary to run a national campaign," Mr. Ridge said in a recent interview. "I had to ask myself: Are you prepared to do what you need to do to have a good chance of winning?

"The answer is, not yet," he said. "Maybe not ever. But not now."

Instead, Mr. Ridge, 61, is days away from launching an international consulting firm, having landed an unusual first client in the prime minister of Albania. Drawing on his experience as congressman, governor and the first secretary of the Department of Homeland Security, Mr. Ridge and a "bench" of experts will offer counseling on security, crisis management and building civic institutions.

Mr. Ridge has drawn criticism already for joining the board of a company whose technology was favored by Homeland Security while Mr. Ridge was secretary.

Mr. Ridge also continues to serve as board chairman of the National Organization on Disability -- he has a childhood hearing impairment that was exacerbated by service in Vietnam -- and as co-chair of the Flight 93 Memorial fund-raising campaign.

He serves on several fee-paying for-profit boards as well, including those of Home Depot and Exelon Corp., the giant Chicago-based utility that owns Peco.

Sitting in an office near the lobbying epicenter of K Street, Mr. Ridge, who

left the Homeland Security Department about two years ago, was relaxed in taking what he called a "breather" from public life.

Yet Pennsylvania's 43rd governor, who served from 1995 to 2001 and now makes his home in suburban Maryland, has not strayed far from politics. He was on the stump for gubernatorial candidate Lynn Swann and Sen. Rick Santorum. Both got creamed, Mr. Ridge conceded with a rueful smile.

"The Democrat organization outperformed us," he said. "In Pennsylvania, the message was: 'Vote for us; we're not Republicans.' "

A "perfect storm" of disaffection with the conduct of the Iraq war, outrage over ethics and corruption charges against GOP elected officials and the wee-hours Harrisburg pay raise thundered upon Republicans, Mr. Ridge said.

He said the Democrats chose a perfect foil for Mr. Santorum in the socially conservative Bob Casey Jr. Asked whether Mr. Santorum was too conservative for most voters in the commonwealth, Mr. Ridge said it went beyond political philosophy.

"Sometimes what hurts Rick is not his conservatism but how he articulates his point of view," Mr. Ridge said. Mr. Santorum's views are shared by other GOP conservatives, he said, "but somehow the intensity of his beliefs are interpreted as being judgmental, and people don't like that."

Mr. Ridge served for four years as the nation's terrorism czar, first as assistant to President Bush on homeland security and then as chief of the new Cabinet-level mega-agency. Critics of the Iraq war have insisted that it has spawned more terrorists and made the United States more vulnerable.

Mr. Ridge rejected that idea.

"Our presence has become a magnet for terrorists, but it's not as if that landscape didn't exist before," he said. "The intellectual groundwork [for radicalism] was laid before the U.S. got there."

Three months after leaving Homeland Security, Mr. Ridge joined the board of Savi Technology, a maker of radio-frequency identification equipment, which his department had promoted. Mr. Ridge was paid in company stock options, which became valuable when Lockheed Martin bought the firm this year.

"My conscience is clear," Mr. Ridge said.

"They followed the ethics rules and guidelines," he said, adding he had informed Savi that his appointment "would be perceived by some as inappropriate."

Christopher Arterton, dean of the political management school at George Washington University, said Mr. Ridge must walk a fine line in his new life.

**LOAD-DATE:** January 3, 2007

**LANGUAGE:** ENGLISH

**GRAPHIC:** PHOTO: Carolyn Kaster/Associated Press: Former Pennsylvania Govs. Tom Ridge, right, and Mark Schweiker greet friends before the unveiling of Mr. Ridge's official portrait June 23 at the Capitol in Harrisburg.

**PUBLICATION-TYPE:** Newspaper

# EXHIBIT E

**washingtonpost.com**

# Contracting Rush For Security Led To Waste, Abuse

By Scott Higham and Robert O'Harrow Jr.
Washington Post Staff Writers
Sunday, May 22, 2005; A01

*First of two articles*

After the terrorist attacks on New York and Washington, the U.S. government rushed to secure the nation. Billions of dollars were spent to protect Americans with improved passenger screening, bomb-detection machines at airports, radiation monitors at ports and computer networks to identify suspected terrorists at the borders.

Government leaders say the nation is safer than it was before Sept. 11, 2001. But the government's internal audits have repeatedly questioned the cost and effectiveness of the equipment and security systems bought from corporations that received a torrent of money under loosened regulations, limited oversight and tight congressional deadlines.

In February, the Office of Management and Budget found that only four of the 33 homeland security programs it examined were "effective." In March, the Homeland Security Department's inspector general noted "the lack of improvement" in the performance of passenger screeners. In April, the Government Accountability Office reported that "the implementation and transformation of DHS remains high-risk."

Scores of government reports, congressional testimony and interviews with dozens of government and business officials document rising costs and specific flaws in some of the major systems underway:

· The contract to hire airport passenger screeners grew to $741 million from $104 million in less than a year. The screeners are failing to detect weapons at roughly the same rate as shortly after the attacks.

· The contract for airport bomb-detection machines ballooned to at least $1.2 billion from $508 million over 18 months. The machines have been hampered by high false-alarm rates.

· A contract for a computer network called US-VISIT to screen foreign visitors could cost taxpayers $10 billion. It relies on outdated technology that puts the project at risk.

· Radiation-detection machines worth a total of a half-billion dollars deployed to screen trucks and cargo containers at ports and borders have trouble distinguishing between highly enriched uranium and common household products. The problem has prompted costly plans to replace the machines.

"Whenever you try to spend a billion dollars in a hurry, you're vulnerable to people who come to the plate and sell you some things that aren't really well prepared," said Paul J. Werbos, a computer expert at the National Science Foundation who advises U.S. government agencies. "The biggest concern is that

Advertisement



Energy
From the
ground,
the sun,
or...?

Roll over to
reveal >

we're going to spend a whole lot of money without getting something useful out of it."

Since fiscal 2001, annual spending on contracts managed by the Homeland Security Department or its precursor agencies has more than doubled, to $5.8 billion, according to data from Eagle Eye Publishers Inc., a company that analyzes government contracting data. The beneficiaries include Unisys Corp., Boeing Co., Lockheed Martin Corp., General Dynamics Corp. and Accenture Ltd., along with such lesser-known companies as Veritas Capital Inc. and Datatrac Information Services Inc.

At a recent gathering of contractors in Northern Virginia, the chief contracting officer for one Homeland Security division said he wasn't sure how his agency had spent $700 million -- more than one-third of its budget last year was listed under "other."

John Ely, executive director for procurement at U.S. Customs and Border Protection, said he was confident that the money could be tracked.

"Don't think because we don't know what that is, we couldn't find out," Ely said on March 31.

Ely said he needed to triple his contracting staff. "There's not enough of us," he said.

Agency officials last week blamed the confusion about the spending on the integration of a new computer system and chronic data-entry mistakes that will be fixed.

Contracting specialists say the push on homeland security came at a time when the government was engaged in a broad effort to turn over key functions to corporations. The trend, begun during the Clinton administration to streamline government, included deep cuts to the federal workforce responsible for contracting and oversight.

Today, government officials often refer to corporations as "partners" rather than contractors. In some cases, companies are even hired to oversee the work of other companies.

"We have allowed the contractors to totally take over the process, and as a result, the costs are getting totally inflated," said D. Kent Goodger, a federal contracting official for 38 years who now teaches federal procurement courses for the Agriculture Department and other agencies. "Right now, it's out of control."

Three years ago, the man whose department was then responsible for leading the efforts to secure the nation's airports questioned whether it was wise to attempt so much in so little time.

"Well, you don't have to be a rocket scientist to figure out you're not going to get from here to there given that kind of production scheme," Transportation Secretary Norman Y. Mineta said in a television interview.

He was roundly criticized for those remarks by the White House and Congress. The deadlines came with consequences.

"Because of the congressional deadlines, it cost a lot more money," said corporate lawyer Angela B. Styles, chief of the OMB's procurement division under President Bush from 2001 to 2003.

"If you had an infrastructure in place with people who knew how to do things quickly, like people from the Department of Defense, you would have had more success," she said. "With the deadlines and the

poor acquisition workforce and the public pressure, it was a recipe for disaster from the very beginning."

In an interview Friday, the deputy secretary of homeland security, Michael P. Jackson, said government leaders deliberately chose to team up with companies to jump-start the country's defense against terrorism, an approach he continues to support. He praised government employees and said their efforts have made the country safer. But Jackson acknowledged that "there were problems, and significant ones," with some of the contracts.

Jackson, who was confirmed in March, said he and recently appointed Homeland Security Secretary Michael Chertoff have made it a top priority to enhance oversight and correct the problems.

"It's good government, and it's what we owe the taxpayers," said Jackson, who was the deputy transportation secretary at the time of the attacks. "It's what we have a core responsibility to do."

## Deadline-Driven Culture

Two months after the planes struck the World Trade Center and the Pentagon, Bush and Congress took steps toward creating a new security infrastructure. On Nov. 19, 2001, Bush signed a bill directing the government to hire and deploy a federal workforce to screen airline passengers and baggage. The act also called for the creation of the Transportation Security Administration.

To speed up the contracting process, the act exempted government officials from Federal Acquisition Regulation guidelines, long the standard for contracting oversight. Congress also gave the government a series of deadlines for putting improvements in place.

To help meet the deadlines, the TSA awarded a contract to NCS Pearson Inc. to hire 30,000 federal screeners within 25 weeks to replace a patchwork of private security firms at the nation's 429 major airports.

After the federal screeners began their work, reports started to circulate that some had criminal records. Federal auditors later discovered that TSA managers did not have reliable databases to conduct background checks. Employment files were disorganized and kept in hundreds of unsecured boxes.

The cost of the Pearson contract rose to $741 million from $104 million. Auditors blamed much of the increase on the deadlines, the lack of TSA supervisors to manage the contract, poor management by Pearson and weak financial controls at the agency.

Auditors later found that TSA managers lacked their own contract officers or a system to monitor companies. The managers routinely relied on information that was "out-of-date, incomplete, inaccurate, or otherwise unreliable," the GAO reported.

Another federal audit questioned $124 million in spending on the Pearson contract, and the government initially withheld $90 million from the company. The auditors also said that from $6 million to $9 million in spending by a subcontractor appeared "to be attributed to wasteful and abusive spending practices," and cited "the complete breakdown of management controls" at Pearson.

Mac Curtis, the president of what is now called Pearson Government Solutions, said in an interview last week that all issues had been resolved and all money had been paid. Curtis said the contract grew largely because the TSA ordered major modifications, including a doubling of the number of screeners hired, to 62,901. The government also requested that an additional 66,219 be pre-certified for immediate hiring.

The TSA also demanded that the job interviews take place at hotels and conference centers rather than at the company's 2,500 assessment centers, which added significantly to the cost, said Curtis, who noted that his company was responsible for hiring the screeners but not training them.

"We met the mission," Curtis said. "We met the mandates."

TSA officials acknowledged that government decisions drove up the cost of the Pearson contract. "We did not properly identify the requirements," said Lee R. Kair, assistant TSA administrator for acquisition. "There was a real sense of speed on this. That's what led to many of the changes."

The Homeland Security Department's inspector general deployed undercover agents to test the new screeners. Such agents try to smuggle weapons or simulated explosive devices through airport checkpoints. Officials use the results to test vulnerabilities in the system.

Last month, the inspector general said that "the lack of improvement since our last audit [a year ago] indicates that significant improvement in performance may not be possible without greater use of new technology."

Jonathan J. Fleming, the TSA's chief operating officer, said the undercover agents are able to evade screeners and their systems at about the same rate as shortly after Sept. 11, 2001. But he and other government officials said the comparison is unfair because the agents testing the screeners are using more sophisticated techniques.

**'A Reasonable Profit'**

When Clark Kent Ervin began his work as the Homeland Security Department's first inspector general in early 2003, he quickly realized that the department was about to become one of the top contracting bureaucracies in Washington without the infrastructure to handle the task. Ervin, a Bush supporter from Texas, found that the new department had poorly staffed contracting offices spread across the 22 agencies that were about to be merged to form the department, the largest federal reorganization since World War II.

Ervin said he tried to alert Tom Ridge, who had recently been confirmed to head the Homeland Security Department.

"Two areas that DHS needs to get control of early to minimize waste and abuse are the procurement and grant [federal assistance] management functions," Ervin wrote in the memo on March 18, 2003, 17 days after the department opened its doors.

The memo urged Ridge to train and supervise the department's contract officers and establish a "robust and effective" program to monitor contractors.

"Early attention to strong systems and controls," the previously undisclosed memo said, "will be critical both to ensuring success and maintaining integrity and accountability."

A few weeks later, Ervin said he was told that Janet Hale, the homeland security undersecretary for management, had held up the delivery of the memo. Ervin said he was told that Hale did not want to give Ridge the news that the systems and controls were not in place. Hale said Friday that she did not recall the episode but that she strongly supports efforts to bolster the department's contracting oversight.

"I would not stop a memo from the IG," she said. "It's just not in my disposition."

Ervin said that he then faxed the memo himself to Ridge's office, but that he never heard back from the secretary.

Ridge said in an interview yesterday that he did not recall receiving the memo but that his department addressed the kinds of issues Ervin raised. "I'll give him the benefit of the doubt that he sent it," Ridge said. "Clark raised a lot of alarm bells. It was his responsibility."

Before long, Ervin was investigating a contract the TSA awarded to Boeing that included the delivery and installation of 1,100 explosive detection systems -- stand-alone, minivan-size machines designed to examine passenger baggage. Even though Boeing's bid was the highest, the company won the contract because TSA officials said they thought Boeing had the expertise to best manage such a complicated federal contract under the deadline pressure.

Boeing subcontracted 92 percent of the work, much of it to two firms that made the machines: L-3 Communications Holdings Inc. and InVision Technologies Inc. Boeing hired other companies to install and maintain the devices.

Ervin's auditors would later find Boeing's contract with the TSA to be extremely favorable to the company.

The TSA guaranteed that all of Boeing's costs would be covered. The agency further guaranteed that Boeing's profit would be based on a percentage of those expenses, the auditors found. Such an arrangement, cited in the inspector general's report as a "cost-plus-a-percentage-of-cost" contract, is banned by federal law, Ervin's office later said in a report.

The contract structure removed an important incentive to hold costs down, Ervin said in an interview. The TSA initially estimated the Boeing contract to be worth $508 million. Within 18 months, the cost more than doubled, to $1.2 billion, auditors found.

In September 2004, Ervin's office issued its critical report, saying the TSA failed to meet its obligation to ensure that Boeing got only "a reasonable profit" on its contract.

As the manager of the contract, Boeing received about $82 million in profit from 2002 to 2003, the report said. That was a 210 percent return on the investment the company had made in the project, Ervin's office found; $49 million of the profit was deemed to be "excessive."

The inspector general also found that the TSA gave the company at least $44 million in award fees without evaluating the company's performance. Ervin described those fees to The Washington Post as "bonuses."

In a written statement to The Post, Boeing disputed the inspector general's findings. The company denied that it received a 210 percent profit or that it had received a prohibited "cost-plus-a-percentage-of-cost" contract. A TSA contracting official on Friday said agency officials "do not believe" they used an inappropriate contract.

The company said the contract grew because it and its subcontractors had to remodel airport lobbies and other areas to accommodate the new machines.

Boeing said the TSA recognized this problem and agreed to adjust the contract accordingly. The contract was modified 54 times, Boeing said.

"This was a very challenging program to execute," Boeing said. "Timelines were very tight and Boeing met all of them."

Boeing noted that the TSA, in its response to the inspector general, said the company was "appropriately compensated."

Elaine C. Duke, who was then the TSA's deputy assistant administrator for acquisition, defended the contract and the agency's handling of it. Duke cited the high-risk nature of the work, the technical complexity of the job, competitive market pressures, the congressional mandate and the lack of staff resources -- there were only five employees in the TSA's acquisition office when the contract was awarded.

"One should recognize that these are unique circumstances that have not and will not be repeated," Duke wrote in her response to the inspector general.

Ervin took a different view.

"The bulk of the work was done by subcontractors. Boeing could have been cut out entirely," he said in a recent interview. "They took advantage of a very good deal they got for themselves."

"The government was just inept," he said. "TSA didn't know what they were doing, or they didn't exercise due control over the contract."

At the time of the Boeing contract, the TSA was handling more than $4 billion worth of contracts without enough staff members to ensure the work was being properly supervised, according to federal auditors. Last year, GAO auditors examined 21 contract files at the TSA. They found that several of the contract files, including one covering work by a subcontractor on the bomb-detection machines, "did not contain evidence of government surveillance to ensure cost efficiency," said Bill Woods, who directed the audit.

The GAO later cited a 2003 TSA internal study estimating that the agency needed as many as 628 employees to run its Office of Acquisition, which awards and monitors contracts. A year later, the office still had only 61 people, the GAO found.

Ron Endicott, a former federal contracting official hired as a consultant in 2003 to help assess the TSA's acquisition workforce, said more contracting officials were needed to watch the money.

"The workforce over there was dying on the vine," said Endicott, who retired from the federal government after nearly four decades. "People were working 16 hours a day, six and seven days a week, and a lot of talented people were leaving. It was dangerously understaffed."

Kair, the TSA contracting official, said he now has 83 acquisition employees and plans to hire more.

After the bomb-detection machines were put in airports across the country, some of them began to register false alarms. Screeners were forced to open and hand-check bags. Lines backed up, infuriating passengers and airline managers.

The false-alarm rates have since come down, according to counter-terrorism experts and government scientists familiar with the machines. They say the reason is that the machines have been calibrated to be less sensitive, cutting the false alarms but also making the machines less effective.

"When used the way they're supposed to be used, they're almost as good as a dog," said a government technology expert intimately familiar with the machines, who spoke on condition of anonymity for fear of retribution. "The big machines have a very high false-alarm rate. As a result, as anybody in counter-terrorism knows, U.S. officials set the standard way too high, and that's bad." The TSA's Fleming disputed that the machines have been made less sensitive, but he said the agency has upgraded the software to improve their effectiveness.

Last month, the GAO issued a report documenting a series of problems with the bomb-detection machines, including poor contract oversight, and said the stand-alone machines were hampered by "operational inefficiencies." The report also faulted TSA officials for not conducting an analysis that might have led them to a better method: installing machines "in-line" with baggage conveyer belts, speeding up and simplifying the process.

Members of Congress are now calling for a new generation of "in-line" machines, which are considered better at detecting explosives because they rely on the latest technology. The cost: an additional $3 billion to $5 billion.

The TSA was forced to choose the lesser technology primarily because of deadline pressure, government scientists and aviation experts said.

"Congress was frustrated. They said, 'We're going to give you a deadline, and you're bloody well going to meet it,' " said Cathal Flynn, associate administer for civil aviation security at the Federal Aviation Administration between 1993 and 2000 who had been working to install bomb-detection machines in airports for years. "Now they have to spend billions of dollars to get these machines out of the lobbies and put the new ones in the baggage lines."

David M. Stone, assistant secretary in charge of the TSA, said the agency is addressing the problems of the past and has made improvements in all areas. "The TSA of today is not the TSA of 2003," he said in an interview Friday.

**A High Risk of Failure**

Last year, in a confidential report prepared for the House Homeland Security Committee by a GAO auditor on loan to the panel, the entire Homeland Security Department was deemed to be at "high risk" of failure. The auditor noted in his report, a copy of which was obtained by The Post, that without a stronger management system, "the agency will not have the ability to effectively protect our homeland."

Financial controls were so lax, auditor Glenn Davis found, that DHS officials were unsure whether a $1.2 billion budget shortfall was real or simply an "accounting irregularity." The confusion prompted the DHS to impose a hiring freeze last spring on new customs and border agents. A few weeks later, budget managers concluded that the shortfall was an accounting error, the report said.

"The ambiguity about staffing levels calls into question whether the department can be confident that there is sufficient manpower at our borders to prevent the unwanted entry of terrorist factions into this country," Davis wrote in his report. "Weaknesses in DHS financial systems also could expose the agency unnecessarily to excess waste, fraud and abuse."

The report noted that contracting officers were too overwhelmed to track and supervise billions of dollars worth of contracts. "DHS still struggles to compile a detailed and accurate listing of its contracts and to keep track of spending by its agencies," the report concluded. Davis declined to discuss his report.

A GAO report released last month found that the Homeland Security Department's Office of Procurement Operations, which monitors many of the department's contracts, had 19 employees supervising an average of $101 million in contracts each. By comparison, 332 employees at the U.S. Coast Guard, a Homeland Security division that runs its own contracting office, averaged $6.3 million.

"If you don't have controls over major programs, chances are increased you're going to waste a lot of money and waste a lot time and keep doing the same things over and over again," said Michael J. Sullivan, a GAO analyst who directed the Homeland Security Department procurement study. "They need to get staffing up. They need to get training up. They need to get a handle on oversight."

Further limiting oversight: No single official has been given clear responsibility for all of the department's procurement spending, Sullivan's report said. The lower-level managers are often poorly trained. In the past year, only 22 percent of homeland security contracts and programs were being supervised by managers who had the necessary training and certification, the GAO auditors said.

As a result, relatively inexperienced government workers are required to monitor corporations armed with highly skilled contract specialists and lawyers, who increasingly work side-by-side with the government workers.

"What's developed over the last decade is a new culture that has put [contracting officials] in a very vulnerable position," said Goodger, the veteran government procurement official.

"From a contracting perspective, it's not a healthy situation," he said. "Contractors typically will take advantage of government employees."

Homeland Security officials acknowledged that their contract oversight staff has been understrength and said they are working to bolster it. They now have 60 people in their procurement office, and they plan to more than double that number.

"You just have to rebuild the workforce," said Hale, the undersecretary for management. "This is terribly important."

**Making 'His Displeasure Known'**

As chief of the Homeland Security Department, Ridge grew frustrated by the drumbeat of bad news contained in the audits, particularly from his department's own office of inspector general, according to Ervin. Twice last year, Ridge summoned the inspector general to his office to complain about his reports, according to Ervin.

Ridge was particularly upset with one report documenting problems with a visa-waiver program and another describing difficulties with terrorist watch lists, Ervin said.

"He said he regarded the reports as being unduly critical," said Ervin, whose political appointment expired in December and who now works at a District think tank. "He was trying to make his displeasure known."

Ridge said he never asked Ervin to "modify or mollify" his reports. But he objected to Ervin's methods.

"I said, 'Do you feel obligated to send every report to the Hill? Does everything you do have to end up in a press release?' "

Ervin said he responded that inspectors general do not answer to agency chiefs but to Congress and the public. "His view was, I wasn't part of the team," Ervin said. "I told him that I thought the team was supposed to be the American people."

*Database editor Sarah Cohen and researcher Alice Crites contributed to this report.*

© 2005 The Washington Post Company

Ads by Google

**Avian Flu is Coming**
How USA Military will deal with an outbreak. Watch video.
www.silversolution.biz

**Airport Security Info**
The Do's And Don'ts For Carry-On Luggage In This Free Article.
www.LifeScript.com

**Voice and Data Installers**
Avaya and Nortel Sales and Service Sub-Contracting, New Construction
www.phonemedic.net

# EXHIBIT F

3 of 1000 DOCUMENTS

US Fed News

May 18, 2006 Thursday 1:08 AM EST

# REP. PASCRELL LASHES OUT AT IRRESPONSIBLE DEPARTMENT OF HOMELAND SECURITY CONTRACTS

**BYLINE:** US Fed News

**LENGTH:** 1166 words

**DATELINE:** WASHINGTON

Rep. Bill Pascrell Jr., D-N.J. (8th CD), issued the following press release:

Rep. Bill Pascrell, Jr. (D-NJ-08) challenged Department of Homeland Security officials to explain irresponsible contracting at a Homeland Security subcommittee hearing today. At the core of Rep. Pascrell's concern was a $21.2 million federal contract issued to a company that is owned by a convicted felon whose criminal record includes petty larceny, attempted robbery, possession of drug paraphernalia and receiving stolen property. The company, Shirlington Limousine Company and Transportation Inc., is also reported to have been involved in illegal activities conducted by disgraced former member of Congress, Randy "Duke" Cunningham, who sat on the powerful Appropriations Subcommittee on Defense.

"It is completely bewildering to me that any contractor with such an extensive criminal record could ever get a penny from the Department of Homeland Security," stated Pascrell. "I'd expect this type of contractor to be on a list of excluded parties. This inexplicable lapse in judgment by the Department signals a need for increased oversight and leadership within the upper ranks. It is inexcusable that DHS is rewarding a felon with federal dollars at the expense of American taxpayers and homeland security. This shameful contract has widened the eyes of Congress. I will continue to demand increased accountability from the federal agency that American people depend on to protect them at home."

On May 5, 2006, Pascrell and U.S. Rep. Bennie Thompson (D-2-MS) the Ranking Member on the Homeland Security Committee sent a letter to the Inspector General of the Department of Homeland Security requesting an investigation into numerous concerns over Shirlington's Limousine's contract with the Department of Homeland Security. The text of the letter is attached below.

May 5, 2006

The Honorable Richard Skinner

Inspector General

Department of Homeland Security

Washington, D.C.

Dear Inspector General Skinner:

On April 29, 2006, the Washington Post reported that Shirlington Limousine and Transportation, Inc., a Washington area limousine service that had been linked to the on-going corruption scandal of former Rep. Randy Cunningham, had been awarded a $21 million contract for limousine services by the Department of Homeland Security.

While recent reports indicate that the current controversy involving Shirlington Limousine revolves around the company's alleged complicity in securing prostitution services for public officials, we are not interested in such accusations.

However, we are concerned about revelations that this company, despite its unsatisfactory past performance and its apparent lack of resources was able to obtain a $21 million contract with the Department. Therefore, we are writing to request that you investigate this company and its contracts with the Department and obtain the answers to the following questions:

1) Shirlington Limousine initially won a contract with the Department for $3.8 million in April 2004. This contract was awarded under the "historically underutilized business zone" (HUBZone) program. According to the Small Business Administration, to qualify under the HUBZone program, a business must meet all of the HUBZone criteria. It must be small, located in a HUBZone, be owned and controlled by one or more U.S. citizens, and at least 35% of its employees from must reside in a HUBZone. We are concerned that Shirlington Limousine may not meet each of these criteria. An internet search did not reveal a physical address for Shirlington Limousine. We did, however, find a Post Office box number and a phone number. Unfortunately, a call to the listed phone number connected with a messaging service located in California. Unfortunately, that service was unable to provide information on the business' physical address. Therefore, please verify that this business meets each of the criteria for a HUBZone enterprise, and specifically whether its physical address at the time of the April 2004 award was within a HUBZone designated area.

2) Additionally, as to the April 2004 contract, it has been widely reported that Shirlington Limousine was the sole bidder. Unfortunately, it is not clear whether this contract was designed as a sole source award or whether this was a full and open competition of the type required under Federal procurement regulations. As you know, under Federal procurement regulations, a sole source award for a contract of this size is generally reserved for instances in which the source selected is the only source capable of providing the goods or services. A sole source contract for routine transportation and limousine services in an area replete with taxicab and limousine services companies, such as the Washington, DC metropolitan area, appears to be a misuse of the sole source designation. Therefore, please determine the rationale for awarding the April 2004 contract as a sole source award.

3) Public records indicate that between 2002 and 2005, the Shirlington Limousine Company had many financial difficulties and performance problems, including court actions for unpaid debts and a contract termination for poor performance. As you know, under Federal procurement regulations a vendor must be deemed a "responsible bidder" by the contracting authority. Given its history of financial and performance problems, please determine the steps taken and the conclusions reached by the Department's acquisitions office to determine that this company was a "responsible bidder."

4) Reports indicate that in October 2005, the Department awarded a $21 million contract to Shirlington Limousine for transportation services. Please provide information on:

a. Whether the Department currently has a motor pool which provides transportation services for its high ranking officials;

b. Whether the Department has leased vehicles for use in official government business, and if so, how many such vehicles are leased;

c. Which officials were given access to utilize the services under the Shirlington Limousine contract;

d. What protocol was established to differentiate the need to use the Limousine service rather than the motor pool or other leased vehicles;

e. Whether a log or other record was kept to determine which Department employees or officials used the Limousine service, and

f. If a log or other record was kept, provide the dates, times of use, and the names of the officials.

It is our understanding that the committee intends to hold a hearing on May 18th which will touch upon this contract. Therefore, we would appreciate a response to these questions prior to the May 18th hearing. As always, thank you for your efforts in ensuring that taxpayer money is efficiently and effectively spent. If you have any questions, please contact Jessica Herrera-Flanigan at (202) 226-2616.

Sincerely,

Bill Pascrell, Jr.

Member of Congress

Bennie Thompson

Member of Congress

Contact: Caley Gray, 202/468-3081.

**LOAD-DATE:** June 14, 2006

**LANGUAGE:** ENGLISH

**PUBLICATION-TYPE:** Newswire

Copyright 2006 HT Media Ltd.
All Rights Reserved

# EXHIBIT G

# CREW | citizens for responsibility and ethics in washington

March 7, 2007

Transportation Security Administration
601 S. 12th Street
11th Floor, East Tower
Arlington, VA 22202
FOIA Officer/Public Liaison: Sophia Young

Dear Ms. Young:

This is to follow-up on CREW's January 10, 2007 FOIA request to the U.S. Department of Homeland Security seeking records from any office of DHS that relate in any way to contacts DHS has had with Chad Wolf, Tom Blank, Ashley Davis, Mark Holman, and C. Stewart Verdery, Jr., and any contracts DHS has entered into with Wexler & Walker, Blank Rome, LLP, and Monument Policy Group, LLC or any of its clients, including Boeing Co., Cross Match Technologies, Inc., and Choicepoint from January, 2005 to the present.

We received DHS's January 17, 2007 response to our initial FOIA which included the Federal Procurement Data System (FPDS) report of those contracts agencies within DHS have entered into with the aforementioned companies from January 2005 to the present.

Based on this report, we have narrowed the scope of our request, and seek documents concerning the following:

1. Procurement action number HSTS0306PSEC056 administered by the Transportation Security Administration with Cross Match Technologies and any records related to the competitive bidding process used to select Cross Match Technologies, individual points of contact representing Cross Match Technologies, unsuccessful proposals submitted for this procurement action, and the price negotiation memorandum for this action;

2. Procurement action number HSTS0306FINS019 administered by the Transportation Security Administration with Choicepoint and any records related to the competitive bidding process used to select Choicepoint, individual points of contact representing Choicepoint, unsuccessful proposals submitted for this procurement action, and the price negotiation memorandum for this action;

3. Procurement action number 00020200206DDTSA2002C00002 administered by the Transportation Security Administration with Boeing Service Company and any records related to the competitive bidding process used to select Boeing, individual points of contact representing Boeing, unsuccessful proposals submitted for this procurement action, and the price negotiation memorandum for this action;

4. Phone logs, meeting records, building access logs or schedules between employees of the Transportation Security Administration and Chad Wolf, Tom



5. Blank, Ashley Davis, Mark Holman, and C. Stewart Verdery, Jr. from January 2005 to the present;

5. Phone logs, meeting records or schedules between employees of the Transportation Security Administration and any employee of Wexler & Walker, Blank Rome, LLP, and Monument Policy Group, LLC from January 2005 to the present.

Please search for responsive records regardless of format, medium, or physical characteristics. We seek records of any kind, including electronic records, audiotapes, videotapes, photographs and back-up tapes.

If it is your position that any portion of the requested records is exempt from disclosure, CREW requests that you provide an index of those documents as required under Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1972). As you are aware, a Vaughn index must describe each document claimed as exempt with sufficient specificity "to permit a reasoned judgment as to whether the material is actually exempt under FOIA." Founding Church of Scientology v. Bell, 603 F.2d 945, 959 (D.C. Cir. 1979). Moreover, the Vaughn index must "describe each document or portion thereof withheld, and for each withholding it must discuss the consequences of supplying the sought-after-information." King v. United States Dep't of Justice, 830 F.2d 210, 223-24 (D.C. Cir. 1987) (emphasis added). Further, "the withholding agency must supply 'a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply.'" Id. at 224, citing Mead Data Central v. United States Dep't of the Air Force, 566 F.2d 242, 251 (D.C. Cir. 1977).

In the event that some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable non-exempt portions of the requested records. See 5 U.S.C. §552(b) ("Any reasonably segregable portion of a records shall be provided to any person requesting such record after deletion of the portions which are exempt ..."); see also Schiller v. Nat'l Labor Relations Bd., 964 F.2d 1205, 1209 (D.C. Cir. 1992). If it is your position that a document contains non-exempt segments, but that those non-exempt segments are so dispersed throughout the document as to make segregation impossible, please state what portion of the document is non-exempt and how the material is dispersed throughout the documents. Mead Data Central, 566 F.2d at 261. Claims of non-segregability must be made with the same degree of detail as required for claims of exemption in a Vaughn index. If a request is denied in whole, please state specifically that it is not reasonable to segregate portions of the record for release.

## Fee Waiver Request

In accordance with 5 U.S.C. §552(a)(4)(A)(iii) and 6 C.F.R. Part 5.11, CREW requests a waiver of fees associated with processing this request for records. The subject of this request concerns the operations of the federal government and the disclosures will likely contribute to a better understanding of relevant government procedures by CREW and the general public in a significant way. This subject is of particular interest and importance to the public in light of a

newspaper report that a substantial number of former officials within DHS have left the Department to obtain lucrative careers as consultants, lobbyists and executives with companies that do billions of dollars' worth of domestic security business with DHS.  See Eric Lipton, "Former Antiterror Officials Find Industry Pays Better," *The New York Times* (June 18, 2006). Moreover, the request is primarily and fundamentally for non-commercial purposes. 5 U.S.C. §552(a)(4)(A)(iii).  See, e.g., McClellan Ecological v. Carlucci, 835 F.2d 1282, 1285 (9th Cir. 1987).  Specifically, these records are likely to contribute to the public's understanding of the process that DHS uses in contracting with outside security firms/entities.

CREW is a non-profit corporation, organized under section 501(c)(3) of the Internal Revenue code.  CREW is committed to protecting the right of citizens to be aware of the activities of government officials and to ensuring the integrity of those officials.  CREW is dedicated to empowering citizens to have an influential voice in government decisions and in the government decision-making process.  The release of information garnered through this request is not in CREW's financial interest.  CREW will analyze the information responsive to this request, and will likely share its analysis with the public, either through memoranda, reports or press releases.  CREW has an established record of carrying out these types of activities, as evidenced through its website, www.citizensforethics.org.  Currently, the CREW website contains links to thousands of pages of documents acquired from multiple FOIA requests.  See http://citizensforethics.org/activities/foia.php.  Visitors to CREW's website can peruse the FOIA request letters, the responses from government agencies, and a growing number of documents responding to FOIA requests.  CREW's virtual reading room provides around-the-clock access to anyone willing to learn about the government activities that were the focus of CREW's FOIA requests.  The CREW website also includes documents relating to CREW's FOIA litigation, Internal Revenue Service complaints, and Federal Election Commission complaints.

Under these circumstances, CREW satisfies fully the criteria for a fee waiver.

## Conclusion

Please respond to this request in writing within 20 days as requested under 5 U.S.C. §552(a)(6)(A)(I).  If all of the requested documents are not available within that time period, CREW requests that you provide it with all requested documents or portions of documents that are available within that time period.

If you have any questions about this request or foresee problems in releasing fully the requested records within the 20-day period, please call me within that time period.  I can be reached at (202) 408-5565.  Also, if CREW's request for a fee waiver is not granted in full, please contact me immediately upon making such a determination.  Please send the requested documents to Kimberly Perkins, Citizens for Responsibility and Ethics in Washington, 1400 Eye Street, N.W., Suite 450, Washington, D.C. 20005.

Thank you for your attention to this matter.

Sincerely,

Kimberly D. Perkins
Counsel
Citizens for Responsibility and Ethics in Washington

**EXHIBIT H**

U.S. Department of Homeland Security

Freedom of Information Act Office
Arlington, VA 22202



MAR 29 2007

**Transportation
Security
Administration**

**FOIA Case Number: TSA 07-0402**

Ms. Kimberly Perkins
CREW
1400 Eye Street, NW Suite 450
Washington, DC 20005

Dear Ms. Perkins:

This is in response to your request for a fee waiver in the processing of your March 7, 2007, Freedom of Information Act (FOIA) request to the Transportation Security Administration (TSA) which was received on March 20, 2007.  Specifically, you requested:

(1)  Procurement action number HSTS0306PSEC056 administered by TSA with Cross Match Technologies and any records related to the competitive bidding process, individual points of contact (POC), unsuccessful proposals, and price negotiation memorandum;

(2)  Procurement action number HSTS0306FINS019 administered by TSA with Choicepoint and any records related to the competitive bidding process, POCs, unsuccessful proposals, and price negotiation memorandum;

(3)  Procurement action number 0020200206DDTSA2002C00002 administered by TSA with Boeing Service Company and any records related to the competitive bidding process, POCs, unsuccessful proposals, and price negotiation memorandum;

(4)  Phone logs, meeting records, building access logs or schedules between employees of TSA and Chad Wolf, Tom Blank, Ashley Davis, Mark Holman, and C. Stewart Verdery Jr. from January 2005 until present;

(5)  Phone logs, meeting records, building access logs or schedules between employees of TSA and any employee of Wexler & Walker, Blank Rome, LLP, and Monument Policy Group, LLC from January 2005 until present.

TSA evaluates fee waiver requests under the legal standard set forth above and the fee waiver policy guidance issued by the Department of Justice on April 2, 1987, as incorporated into the Department of Homeland Security's Freedom of Information Act regulations.  These regulations set forth six factors to examine in determining whether the applicable legal standard for fee waiver has been met. 6 CFR § 5.11(k)(2).  We will consider these factors in our evaluation of your request for a fee waiver: (1) whether the subject of the requested records concerns "the operations or activities of the government"; (2) whether the disclosure is "likely to contribute" to an understanding of government operations or activities; (3) whether disclosure of the requested information will contribute to the understanding of the public at large, as opposed to the individual understanding of the requestor of a narrow segment of interested persons; (4) whether the contribution to public understanding of government operations or activities will be "significant"; (5) whether the requester has a commercial interest that would be furthered by the requested disclosure; and (6) whether the magnitude of any

identified commercial interest to the requestor is sufficiently large in comparison with the public interest in disclosure that disclosure is primarily in the commercial interest of the requestor.

As a requester, you bear the burden under the FOIA of showing that the fee waiver requirements have been met. A fee waiver is granted based on a determination that the substantive content of the disclosable portions of the records requested is likely to contribute significantly to public understanding of government operations or activities. See 5 U.S.C. § 552(a)(4)(A)(iii). Information that is already in the public domain is not likely to contribute to public understanding.

After reviewing your March 7th letter, the Transportation Security Administration (TSA) is denying your request for a fee waiver.

Administrative appeal from this determination may be made in writing to Kimberly Walton, Acting Special Counselor, Office of the Special Counselor, Transportation Security Administration, 601 South 12th Street, East Building, E7-121S, Arlington, VA 22202-4220. Your appeal **must be submitted within 60 days** from the date of this determination. It should contain your FOIA request number and state, to the extent possible, the reasons why you believe the initial determination should be reversed. In addition, the envelope in which the appeal is mailed in should be prominently marked "FOIA Appeal." The Special Counselor's determination will be administratively final.

If you have any questions, or would like to discuss this matter, please feel free to contact the FOIA office at 1-866-FOIA-TSA (364-2872).

Sincerely,

Kevin J. Janet
FOIA Officer
Freedom of Information Act Office

**EXHIBIT I**

# CREW | citizens for responsibility and ethics in washington

May 1, 2007

Kimberly Walton
Office of the Special Counsel
Transportation Security Administration
601 South 12th Street
East Building, E7-121S
Arlington, VA 22202-4220

Re: FOIA Request Case Number: TSA07-0402

Dear Ms. Walton:

This is in response to your March 29, 2007 letter which acknowledges receipt of CREW's March 7, 2007 FOIA request for documents and denies CREW's request for a fee waiver. CREW hereby appeals your denial of a fee waiver and requests that you reverse it for the reasons set forth below.

CREW's March 7, 2007 FOIA requested documents related in any way to contracts the Transportation Security Administration ("TSA") entered into with several outside security firms and vendors. See Letter from Kimberly D. Perkins to FOIA Officer/Public Liaison Sophia Young, March 7, 2007 (attached as Exhibit A). Despite CREW's clearly articulated grounds for a fee waiver request, specifically that, "these records are likely to contribute to the public's understanding of the process that DHS uses in contracting with outside security firms/entities," TSA simply denied this request with no discussion whatsoever as to the basis of its denial. See Letter from TSA FOIA Officer Kevin J. Janet to Kimberly D. Perkins, March 29, 2007 (attached as Exhibit B).

Pursuant to 6 C.F.R. § 5.11(k)(2), CREW fully satisfies TSA's six-part criteria for a complete waiver of fees. First, the records CREW seeks concern "the operations or activities of the government" as they are procurement actions TSA entered into with several outside vendors.

Second, the disclosure of the information sought is likely to contribute significantly to the public understanding of government operations because the records will likely show the "process that DHS uses in contracting with outside security firms/entities." See Letter from Kimberly D. Perkins to TSA FOIA Officer/Public Liaison Sophia Young (March 7, 2007). Specifically, CREW has requested documents that pertain to how TSA manages taxpayer money in its award of contracts to vendors. The information received will provide critical information that has not been previously made available to the public. The nature of the information as primary source material rather than secondary reporting will allow the public to engage in a deeper and more specific examination of the administration's management of taxpayer dollars to award contracts to outside security firms and entities.

Kimberly Walton
May 1, 2007
Page 2

With respect to the third and fourth criteria, the disclosure of the requested information will contribute to the understanding of the public "at large," and the contribution to the public understanding of how the government distributes taxpayer dollars through contracting will be "significant." This subject is of particular interest and importance to the public at large in light of several newspaper reports that a substantial number of former officials within DHS have left the Department to obtain lucrative careers as consultants, lobbyists and executives with companies that do billions of dollars' worth of domestic security business with DHS. See, e.g., Eric Lipton, "Former Antiterror Officials Find Industry Pays Better," *The New York Times* (June 18, 2006) (attached as Exhibit C); Sarah Posner, Security for Sale, *The American Prospect*, January 1, 2006 (attached as Exhibit D). Additionally, this information is significant because of the increased attention DHS and its components have received over its mismanagement of taxpayer money through its continuous problems with contracting out. Scott Higham and Robert O'Harrow, Jr., Contracting rush for security led to waste, abuse, *The Washington Post*, May 22, 2005 (attached as Exhibit E); *U.S. Fed News*, Rep. Pascrell Lashes Out at Irresponsible Department of Homeland Security Contracts, May 18, 2006 (attached as Exhibit F).

As to criteria five and six, CREW is not seeking the documents for any commercial purpose. Instead, CREW will analyze the information it receives that is responsive to its request, and will share it with the public through memoranda, reports, or press releases. For example, *The Washington Post* just issued a news-breaking article about the problems with the federal government's distribution of foreign aid to Hurricane Katrina victims that relied significantly on documents CREW obtained through a FOIA request. John Solomon and Spencer S. Hsu, Most Katrina Aid from Overseas Went Unclaimed, *The Washington Post*, April 29, 2007 (attached as Exhibit G). In addition, CREW will disseminate any documents it acquires from its request to the public through its website, www.citizensforethics.org. Currently, the CREW website contains links to thousands of pages of documents acquired from multiple FOIA requests. See http://citizensforethics.org/activities/foia.php. Visitors to CREW's website can peruse the FOIA request letters, the responses from government agencies, and a growing number of documents responding to FOIA requests. CREW's virtual reading room provides around-the-clock access to anyone willing to learn about the government activities that were the focus of CREW's FOIA requests. The CREW website also includes documents relating to CREW's FOIA litigation, Internal Revenue Service complaints, and Federal Election Commission complaints.

Finally, it should be noted that the U.S. District Court for the District of Columbia recently concluded in CREW v. HHS, a lawsuit CREW filed against HHS after the agency decided that CREW did not qualify for a public interest fee waiver, that the information CREW sought would "likely reveal meaningful information about HHS Operations that is not already public knowledge" and, as such, CREW was entitled to a public interest fee waiver. CREW v. HHS, No. 05-1127 slip op. at 11, 30 (D.D.C. 2006). There, CREW sought documents related to contacts any office of HHS had with any external public affairs firms, any contracts HHS entered into with any public affairs firm and any records of contacts any HHS employee had with any

Kimberly Walton
May 1, 2007
Page 3

employee of any public affairs firm with which HHS had a contractual relationship. Id. at 2.
Similar to the case here, CREW sought this information to share and disseminate to the public
through memoranda, reports and its website. Id. at 3. Judge Kollar-Kotelly found that "the
informative value of a request depends not on there being certainty of what the documents reveal,
but rather on the requesting party having explained with reasonable specificity how those
documents would increase public knowledge of the functions of the government." Id. at 13.
Here, there is no question that in the wake of the various and extensive reports of contracting
waste and mismanagement within the components of DHS there is an increased awareness by the
public of the administration's contracting process in the security arena, and the information
CREW seeks will add to that awareness by revealing how the TSA administers and awards its
contracts to security firms and entities.

If you have any questions about this fee waiver appeal please call me at (202) 408-5565.
Please send the requested documents to me at Citizens for Responsibility and Ethics in
Washington, 1400 Eye Street, N.W., Suite 450, Washington, D.C. 20005.

Sincerely,

Kimberly D. Perkins
Counsel
Citizens for Responsibility and Ethics in Washington

Enclosures

# EXHIBIT J

# CREW | citizens for responsibility and ethics in washington

March 7, 2007

U.S. Immigration & Customs Enforcement
800 North Capitol Street, N.W.
5th Floor, Suite 585
Washington, D.C. 20528
FOIA Officer: Catrina Pavlik-Keenan

Dear Ms. Keenan:

This is to follow-up on CREW's January 10, 2007 FOIA request to the U.S. Department of Homeland Security seeking records from any office of DHS that relate in any way to contacts DHS has had with C. Suzanne Mencer, C. Stewart Verdery, Jr., Chad Wolf, Tom Blank, Ashley Davis, and Mark Holman, any contracts DHS has entered into with Brownstein Hyatt Farber Schreck (formerly known as Brownstein Hyatt & Farber, P.C.), Wexler & Walker, Blank Rome, LLP, and Monument Policy Group, LLC or any of its clients, including Zoll Medical Corporation, Homeland Security Corporation, Cross Match Technologies, Inc., and Choicepoint from January, 2005 to the present.

We received DHS's January 17, 2007 response to our initial FOIA which included the Federal Procurement Data System (FPDS) report of those contracts agencies within DHS have entered into with the aforementioned companies from January 2005 to the present.

Based on this report, we have narrowed the scope of our request, and seek documents concerning the following:

1.  Procurement action numbers HSCEAM05F00108, HSCEAM05F00198, HSCEAM05F00396 administered by the U.S. Immigration & Customs Enforcement with Zoll Medical Corporation and any records related to the competitive bidding process used to select Zoll Medical Corporation, individual points of contact representing Zoll Medical Corporation, unsuccessful proposals submitted for this procurement action, and the price negotiation memorandum for this action;

2.  Procurement action numbers HSCEOP05F00197 and HSCEOP05F00290 administered by the U.S. Immigration & Customs Enforcement with Cross Match Technologies and any records related to the competitive bidding process used to select Cross Match Technologies, individual points of contact representing Cross Match Technologies, unsuccessful proposals submitted for this procurement action, and the price negotiation memorandum for this action;

3.  Procurement action numbers HSCEOP05F00004, HSCEOP06F00026, HSCEOP06F00028, HSCEOP06F00664, HSCEOP06F00714, HSCEOP06F00718, HSCEOP06F00724, HSCEOP06F00754, HSCEOP06F00768, HSCEOP06F00780, HSCEOP06F01692,





HSCEOP07F00002, HSCEOP07F00003, HSCEOP07F00009, HSCEOP07F00217, and HSCEOP07F00224 administered by the U.S. Immigration & Customs Enforcement with Choicepoint and any records related to the competitive bidding process used to select Choicepoint, individual points of contact representing Choicepoint, unsuccessful proposals submitted for this procurement action, and the price negotiation memorandum for this action;

4.    Procurement action number HSCEAM05P00155 administered by the U.S. Immigration & Customs Enforcement with Homeland Security Corporation and any records related to the competitive bidding process used to select Homeland Security Corporation, individual points of contact representing Homeland Security Corporation, unsuccessful proposals submitted for this procurement action, and the price negotiation memorandum for this action;

5.    Phone logs, meeting records, building access logs or schedules between employees of the U.S. Immigration & Customs Enforcement and Chad Wolf, Tom Blank, Ashley Davis, Mark Holman, C. Stewart Verdery, Jr., and C. Suzanne Mencer from January 2005 to the present;

6.    Phone logs, meeting records or schedules between employees of the U.S. Immigration & Customs Enforcement and any employee of Wexler & Walker, Blank Rome, LLP, Monument Policy Group, LLC, and Brownstein Hyatt Farber Schreck (formerly known as Brownstein Hyatt & Farber, P.C.) from January 2005 to the present.

Please search for responsive records regardless of format, medium, or physical characteristics. We seek records of any kind, including electronic records, audiotapes, videotapes, photographs and back-up tapes.

If it is your position that any portion of the requested records is exempt from disclosure, CREW requests that you provide an index of those documents as required under Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1972). As you are aware, a Vaughn index must describe each document claimed as exempt with sufficient specificity "to permit a reasoned judgment as to whether the material is actually exempt under FOIA." Founding Church of Scientology v. Bell, 603 F.2d 945, 959 (D.C. Cir. 1979). Moreover, the Vaughn index must "describe each document or portion thereof withheld, and for **each** withholding it must discuss the consequences of supplying the sought-after-information." King v. United States Dep't of Justice, 830 F.2d 210, 223-24 (D.C. Cir. 1987) (emphasis added). Further, "the withholding agency must supply 'a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply.'" Id. at 224, citing Mead Data Central v. United States Dep't of the Air Force, 566 F.2d 242, 251 (D.C. Cir. 1977).

In the event that some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable non-exempt portions of the requested records. See 5 U.S.C. §552(b) ("Any reasonably segregable portion of a records shall be provided to any person requesting such record after deletion of the portions which are exempt ..."); see also Schiller v. Nat'l Labor Relations Bd., 964 F.2d 1205, 1209 (D.C. Cir.

1992). If it is your position that a document contains non-exempt segments, but that those non-exempt segments are so dispersed throughout the document as to make segregation impossible, please state what portion of the document is non-exempt and how the material is dispersed throughout the documents. <u>Mead Data Central</u>, 566 F.2d at 261. Claims of non-segregability must be made with the same degree of detail as required for claims of exemption in a <u>Vaughn</u> index. If a request is denied in whole, please state specifically that it is not reasonable to segregate portions of the record for release.

### Fee Waiver Request

In accordance with 5 U.S.C. §552(a)(4)(A)(iii) and 6 C.F.R. Part 5.11, CREW requests a waiver of fees associated with processing this request for records. The subject of this request concerns the operations of the federal government and the disclosures will likely contribute to a better understanding of relevant government procedures by CREW and the general public in a significant way. This subject is of particular interest and importance to the public in light of a newspaper report that a substantial number of former officials within DHS have left the Department to obtain lucrative careers as consultants, lobbyists and executives with companies that do billions of dollars' worth of domestic security business with DHS. <u>See</u> Eric Lipton, "<u>Former Antiterror Officials Find Industry Pays Better</u>," *The New York Times* (June 18, 2006). Moreover, the request is primarily and fundamentally for non-commercial purposes. 5 U.S.C. §552(a)(4)(A)(iii). <u>See</u>, <u>e.g.</u>, <u>McClellan Ecological v. Carlucci</u>, 835 F.2d 1282, 1285 (9th Cir. 1987). Specifically, these records are likely to contribute to the public's understanding of the process that DHS uses in contracting with outside security firms/entities.

CREW is a non-profit corporation, organized under section 501(c)(3) of the Internal Revenue code. CREW is committed to protecting the right of citizens to be aware of the activities of government officials and to ensuring the integrity of those officials. CREW is dedicated to empowering citizens to have an influential voice in government decisions and in the government decision-making process. The release of information garnered through this request is not in CREW's financial interest. CREW will analyze the information responsive to this request, and will likely share its analysis with the public, either through memoranda, reports or press releases. CREW has an established record of carrying out these types of activities, as evidenced through its website, www.citizensforethics.org. Currently, the CREW website contains links to thousands of pages of documents acquired from multiple FOIA requests. <u>See</u> http://citizensforethics.org/activities/foia.php. Visitors to CREW's website can peruse the FOIA request letters, the responses from government agencies, and a growing number of documents responding to FOIA requests. CREW's virtual reading room provides around-the-clock access to anyone willing to learn about the government activities that were the focus of CREW's FOIA requests. The CREW website also includes documents relating to CREW's FOIA litigation, Internal Revenue Service complaints, and Federal Election Commission complaints.

Under these circumstances, CREW satisfies fully the criteria for a fee waiver.

## Conclusion

Please respond to this request in writing within 20 days as requested under 5 U.S.C. §552(a)(6)(A)(I). If all of the requested documents are not available within that time period, CREW requests that you provide it with all requested documents or portions of documents that are available within that time period.

If you have any questions about this request or foresee problems in releasing fully the requested records within the 20-day period, please call me within that time period. I can be reached at (202) 408-5565. Also, if CREW's request for a fee waiver is not granted in full, please contact me immediately upon making such a determination. Please send the requested documents to Kimberly Perkins, Citizens for Responsibility and Ethics in Washington, 1400 Eye Street, N.W., Suite 450, Washington, D.C. 20005.

Thank you for your attention to this matter.

Sincerely,

Kimberly D. Perkins
Counsel
Citizens for Responsibility and Ethics in Washington

**CREW** | citizens for responsibility
and ethics in washington

1400 Eye Street, N.W.
Suite 450
Washington, D.C. 20005

U.S. Immigration & Customs Enforcement
Attn: FOIA Officer: Catrina Pavlik-Keenan
800 North Capitol Street, N.W.
5th Floor, Suite 585
Washington, D.C. 20528





UNITED STATES POSTAGE
PITNEY BOWES
02 1P        $ 000.390
0002629848   MAR 07 2007
MAILED FROM ZIP CODE 20005

# EXHIBIT K

# CREW | citizens for responsibility and ethics in washington

March 7, 2007

U.S. Customs & Border Protection
1300 Pennsylvania Avenue, N.W.
Mint Annex
Washington, D.C. 20229
FOIA Officer/Public Liaison: Shari Suzuki

Dear Ms. Suzuki:

This is to follow-up on CREW's January 10, 2007 FOIA request to the U.S. Department of Homeland Security seeking records from any office of DHS that relate in any way to contacts DHS has had with Chad Wolf, Tom Blank, Ashley Davis, Mark Holman, C. Stewart Verdery, Jr., and C. Suzanne Mencer, and any contracts DHS has entered into with Wexler & Walker, Blank Rome, LLP, Monument Policy Group, LLC, and Brownstein Hyatt Farber Schreck (formerly known as Brownstein Hyatt & Farber, P.C.), or any of its clients, including Boeing Co., IBM, Cross Match Technologies, Inc., and Choicepoint from January, 2005 to the present.

We received DHS's January 17, 2007 response to our initial FOIA which included the Federal Procurement Data System (FPDS) report of those contracts agencies within DHS have entered into with the aforementioned companies from January 2005 to the present.

Based on this report, we have narrowed the scope of our request, and seek documents concerning the following:

1.  Procurement action numbers HSBP1005P06664, HSBP1006F09215, HSBP1006F09525, HSBP1006P08209, HSBP1106F09289, HSBP1106F09748, HSBP1106F10233, and HSBP1107F14272 administered by U.S. Customs and Border Protection with Choicepoint and any records related to the competitive bidding process used to select Choicepoint, individual points of contact representing Choicepoint, unsuccessful proposals submitted for this procurement action, and the price negotiation memorandum for this action;

2.  Procurement action numbers HSBP1006J13313 and HSBP1006J13776 administered by U.S. Customs and Border Protection with Boeing Service Company and any records related to the competitive bidding process used to select Boeing, individual points of contact representing Boeing, unsuccessful proposals submitted for this procurement action, and the price negotiation memorandum for this action;

3.  Procurement action number CS001200204DTC02020 administered by U.S. Customs and Border Protection with IBM and any records related to the competitive bidding process used to select IBM, individual points of contact representing IBM, unsuccessful proposals submitted for this procurement action, and the price negotiation memorandum for this action;

4.    Procurement action number HSBP1107F14317 administered by U.S. Customs and Border Protection with Cross Match Technologies and any records related to the competitive bidding process used to select Cross Match Technologies, individual points of contact representing Cross Match Technologies, unsuccessful proposals submitted for this procurement action, and the price negotiation memorandum for this action;

5.    Phone logs, meeting records, building access logs or schedules between employees of the U.S. Customs and Border Protection and Chad Wolf, Tom Blank, Ashley Davis, Mark Holman, C. Stewart Verdery, Jr., C. Suzanne Mencer from January 2005 to the present;

6.    Phone logs, meeting records or schedules between employees of the U.S. Customs and Border Protection and any employee of Wexler & Walker, Blank Rome, LLP, Monument Policy Group, LLC, and Brownstein Hyatt Farber Schreck (formerly known as Brownstein Hyatt & Farber, P.C.) from January 2005 to the present.

Please search for responsive records regardless of format, medium, or physical characteristics. We seek records of any kind, including electronic records, audiotapes, videotapes, photographs and back-up tapes.

If it is your position that any portion of the requested records is exempt from disclosure, CREW requests that you provide an index of those documents as required under Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1972). As you are aware, a Vaughn index must describe each document claimed as exempt with sufficient specificity "to permit a reasoned judgment as to whether the material is actually exempt under FOIA." Founding Church of Scientology v. Bell, 603 F.2d 945, 959 (D.C. Cir. 1979). Moreover, the Vaughn index must "describe each document or portion thereof withheld, and for **each** withholding it must discuss the consequences of supplying the sought-after-information." King v. United States Dep't of Justice, 830 F.2d 210, 223-24 (D.C. Cir. 1987) (emphasis added). Further, "the withholding agency must supply 'a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply.'" Id. at 224, citing Mead Data Central v. United States Dep't of the Air Force, 566 F.2d 242, 251 (D.C. Cir. 1977).

In the event that some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable non-exempt portions of the requested records. See 5 U.S.C. §552(b) ("Any reasonably segregable portion of a records shall be provided to any person requesting such record after deletion of the portions which are exempt ..."); see also Schiller v. Nat'l Labor Relations Bd., 964 F.2d 1205, 1209 (D.C. Cir. 1992). If it is your position that a document contains non-exempt segments, but that those non-exempt segments are so dispersed throughout the document as to make segregation impossible, please state what portion of the document is non-exempt and how the material is dispersed throughout the documents. Mead Data Central, 566 F.2d at 261. Claims of non-segregability must be made with the same degree of detail as required for claims of exemption in a Vaughn

2

index. If a request is denied in whole, please state specifically that it is not reasonable to segregate portions of the record for release.

## Fee Waiver Request

In accordance with 5 U.S.C. §552(a)(4)(A)(iii) and 6 C.F.R. Part 5.11, CREW requests a waiver of fees associated with processing this request for records. The subject of this request concerns the operations of the federal government and the disclosures will likely contribute to a better understanding of relevant government procedures by CREW and the general public in a significant way. This subject is of particular interest and importance to the public in light of a newspaper report that a substantial number of former officials within DHS have left the Department to obtain lucrative careers as consultants, lobbyists and executives with companies that do billions of dollars' worth of domestic security business with DHS. See Eric Lipton, "Former Antiterror Officials Find Industry Pays Better," *The New York Times* (June 18, 2006). Moreover, the request is primarily and fundamentally for non-commercial purposes. 5 U.S.C. §552(a)(4)(A)(iii). See, e.g., McClellan Ecological v. Carlucci, 835 F.2d 1282, 1285 (9th Cir. 1987). Specifically, these records are likely to contribute to the public's understanding of the process that DHS uses in contracting with outside security firms/entities.

CREW is a non-profit corporation, organized under section 501(c)(3) of the Internal Revenue code. CREW is committed to protecting the right of citizens to be aware of the activities of government officials and to ensuring the integrity of those officials. CREW is dedicated to empowering citizens to have an influential voice in government decisions and in the government decision-making process. The release of information garnered through this request is not in CREW's financial interest. CREW will analyze the information responsive to this request, and will likely share its analysis with the public, either through memoranda, reports or press releases. CREW has an established record of carrying out these types of activities, as evidenced through its website, www.citizensforethics.org. Currently, the CREW website contains links to thousands of pages of documents acquired from multiple FOIA requests. See http://citizensforethics.org/activities/foia.php. Visitors to CREW's website can peruse the FOIA request letters, the responses from government agencies, and a growing number of documents responding to FOIA requests. CREW's virtual reading room provides around-the-clock access to anyone willing to learn about the government activities that were the focus of CREW's FOIA requests. The CREW website also includes documents relating to CREW's FOIA litigation, Internal Revenue Service complaints, and Federal Election Commission complaints.

Under these circumstances, CREW satisfies fully the criteria for a fee waiver.

## Conclusion

Please respond to this request in writing within 20 days as requested under 5 U.S.C. §552(a)(6)(A)(I). If all of the requested documents are not available within that time period,

CREW requests that you provide it with all requested documents or portions of documents that are available within that time period.

If you have any questions about this request or foresee problems in releasing fully the requested records within the 20-day period, please call me within that time period. I can be reached at (202) 408-5565. Also, if CREW's request for a fee waiver is not granted in full, please contact me immediately upon making such a determination. Please send the requested documents to Kimberly Perkins, Citizens for Responsibility and Ethics in Washington, 1400 Eye Street, N.W., Suite 450, Washington, D.C. 20005.

Thank you for your attention to this matter.

Sincerely,

Kimberly D. Perkins
Counsel
Citizens for Responsibility and Ethics in Washington

4

**CREW** | citizens for responsibility
and ethics in washington

1400 Eye Street, N.W.
Suite 450
Washington, D.C. 20005

U.S. Customs and Border Protection
Attn: FOIA Officer/Public Liaison: Shari Suzuki
1300 Pennsylvania Avenue, N.W.
Mint Annex
Washington, D.C. 20229



UNITED STATES POSTAGE
PITNEY BOWES
$ 000.39⁰
02 1P     $ 000.39
0002629848  MAR 07 2007
MAILED FROM ZIP CODE 20005

# EXHIBIT L

# CREW | citizens for responsibility and ethics in washington

March 7, 2007

Federal Emergency Management Agency
500 C Street, S.W., Room 840
FOIA Officer/Public Liaison: Jeff Ovall
Washington, D.C. 20472

Dear Mr. Ovall:

This is to follow-up on CREW's January 10, 2007 FOIA request to the U.S. Department of Homeland Security seeking records from any office of DHS that relate in any way to contacts DHS has had with C. Suzanne Mencer, Chad Wolf, and Tom Blank, any contracts DHS has entered into with Brownstein Hyatt Farber Schreck (formerly known as Brownstein Hyatt & Farber, P.C.) and Wexler & Walker, or any of its clients, including Zoll Medical Corporation, Tetra Tech Inc., and Choicepoint from January, 2005 to the present.

We received DHS's January 17, 2007 response to our initial FOIA which included the Federal Procurement Data System (FPDS) report of those contracts agencies within DHS have entered into with the aforementioned companies from January 2005 to the present.

Based on this report, we have narrowed the scope of our request, and seek documents concerning the following:

1. Procurement action number HSFEHQ05F0794 administered by the Federal Emergency Management Agency with Zoll Medical Corporation and any records related to the competitive bidding process used to select Zoll Medical Corporation, individual points of contact representing Zoll Medical Corporation, unsuccessful proposals submitted for this procurement action, and the price negotiation memorandum for this action;

2. Procurement action number HSFEHQ05J0384 administered by the Federal Emergency Management Agency with Choicepoint and any records related to the competitive bidding process used to select Choicepoint, individual points of contact representing Choicepoint, unsuccessful proposals submitted for this procurement action, and the price negotiation memorandum for this action;

3. Procurement action numbers HSFEEM06P6350235, HSFEEM06P6350236, HSFEEM06P6350237, HSFEEM06P6350245, HSFEEM06P6350261, administered by the Federal Emergency Management Agency with Tetra Tech, Incorporated and any records related to the competitive bidding process used to select Tetra Tech, individual points of contact representing Tetra Tech, unsuccessful proposals submitted for this procurement action, and the price negotiation memorandum for this action;

4. Phone logs, meeting records, building access logs or schedules between employees of the Federal Emergency Management Agency and Chad Wolf, Tom

Blank, and C. Suzanne Mencer from January 2005 to the present;

5.  Phone logs, meeting records or schedules between employees of the Federal Emergency Management Agency and any employee of Wexler & Walker and Brownstein Hyatt Farber Schreck (formerly known as Brownstein Hyatt & Farber, P.C.) from January 2005 to the present.

Please search for responsive records regardless of format, medium, or physical characteristics. We seek records of any kind, including electronic records, audiotapes, videotapes, photographs and back-up tapes.

If it is your position that any portion of the requested records is exempt from disclosure, CREW requests that you provide an index of those documents as required under Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1972). As you are aware, a Vaughn index must describe each document claimed as exempt with sufficient specificity "to permit a reasoned judgment as to whether the material is actually exempt under FOIA." Founding Church of Scientology v. Bell, 603 F.2d 945, 959 (D.C. Cir. 1979). Moreover, the Vaughn index must "describe each document or portion thereof withheld, and for **each** withholding it must discuss the consequences of supplying the sought-after-information." King v. United States Dep't of Justice, 830 F.2d 210, 223-24 (D.C. Cir. 1987) (emphasis added). Further, "the withholding agency must supply 'a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply.'" Id. at 224, citing Mead Data Central v. United States Dep't of the Air Force, 566 F.2d 242, 251 (D.C. Cir. 1977).

In the event that some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable non-exempt portions of the requested records. See 5 U.S.C. §552(b) ("Any reasonably segregable portion of a records shall be provided to any person requesting such record after deletion of the portions which are exempt ..."); see also Schiller v. Nat'l Labor Relations Bd., 964 F.2d 1205, 1209 (D.C. Cir. 1992). If it is your position that a document contains non-exempt segments, but that those non-exempt segments are so dispersed throughout the document as to make segregation impossible, please state what portion of the document is non-exempt and how the material is dispersed throughout the documents. Mead Data Central, 566 F.2d at 261. Claims of non-segregability must be made with the same degree of detail as required for claims of exemption in a Vaughn index. If a request is denied in whole, please state specifically that it is not reasonable to segregate portions of the record for release.

## Fee Waiver Request

In accordance with 5 U.S.C. §552(a)(4)(A)(iii) and 6 C.F.R. Part 5.11, CREW requests a waiver of fees associated with processing this request for records. The subject of this request concerns the operations of the federal government and the disclosures will likely contribute to a better understanding of relevant government procedures by CREW and the general public in a

2

significant way. This subject is of particular interest and importance to the public in light of a newspaper report that a substantial number of former officials within DHS have left the Department to obtain lucrative careers as consultants, lobbyists and executives with companies that do billions of dollars' worth of domestic security business with DHS. See Eric Lipton, "Former Antiterror Officials Find Industry Pays Better," *The New York Times* (June 18, 2006). Moreover, the request is primarily and fundamentally for non-commercial purposes. 5 U.S.C. §552(a)(4)(A)(iii). See, e.g., McClellan Ecological v. Carlucci, 835 F.2d 1282, 1285 (9th Cir. 1987). Specifically, these records are likely to contribute to the public's understanding of the process that DHS uses in contracting with outside security firms/entities.

CREW is a non-profit corporation, organized under section 501(c)(3) of the Internal Revenue code. CREW is committed to protecting the right of citizens to be aware of the activities of government officials and to ensuring the integrity of those officials. CREW is dedicated to empowering citizens to have an influential voice in government decisions and in the government decision-making process. The release of information garnered through this request is not in CREW's financial interest. CREW will analyze the information responsive to this request, and will likely share its analysis with the public, either through memoranda, reports or press releases. CREW has an established record of carrying out these types of activities, as evidenced through its website, www.citizensforethics.org. Currently, the CREW website contains links to thousands of pages of documents acquired from multiple FOIA requests. See http://citizensforethics.org/activities/foia.php. Visitors to CREW's website can peruse the FOIA request letters, the responses from government agencies, and a growing number of documents responding to FOIA requests. CREW's virtual reading room provides around-the-clock access to anyone willing to learn about the government activities that were the focus of CREW's FOIA requests. The CREW website also includes documents relating to CREW's FOIA litigation, Internal Revenue Service complaints, and Federal Election Commission complaints.

Under these circumstances, CREW satisfies fully the criteria for a fee waiver.

## Conclusion

Please respond to this request in writing within 20 days as requested under 5 U.S.C. §552(a)(6)(A)(I). If all of the requested documents are not available within that time period, CREW requests that you provide it with all requested documents or portions of documents that are available within that time period.

If you have any questions about this request or foresee problems in releasing fully the requested records within the 20-day period, please call me within that time period. I can be reached at (202) 408-5565. Also, if CREW's request for a fee waiver is not granted in full, please contact me immediately upon making such a determination. Please send the requested documents to Kimberly Perkins, Citizens for Responsibility and Ethics in Washington, 1400 Eye Street, N.W., Suite 450, Washington, D.C. 20005.

3

Thank you for your attention to this matter.

Sincerely,

Kimberly D. Perkins
Counsel
Citizens for Responsibility and Ethics in Washington

# CREW | citizens for responsibility and ethics in washington

1400 Eye Street, N.W.
Suite 450
Washington, D.C. 20005

Federal Emergency Management Agency
Attn: FOIA Officer/Public Liaison: Jeff Ovall
500 C Street, S.W., Room 840
Washington, D.C. 20472





UNITED STATES POSTAGE
$ 000.39⁰
PITNEY BOWES
02 1P          $ 000.39⁰
0002629848  MAR 07 200⁷
MAILED FROM ZIP CODE 20005

# EXHIBIT M

# CREW | citizens for responsibility and ethics in washington

March 7, 2007

U.S. Coast Guard
Commandant (CG-611)
2100 2nd Street, S.W.
Attn: FOIA Coordinator
Washington, D.C. 20593-0001

Dear FOIA Coordinator:

This is to follow-up on CREW's January 10, 2007 FOIA request to the U.S. Department of Homeland Security seeking records from any office of DHS that relate in any way to contacts DHS has had with Chad Wolf, Tom Blank, C. Stewart Verdery, Jr., C. Suzanne Mencer, and Deborah Rosenblum, and any contracts DHS has entered into with Wexler & Walker, Monument Policy Group, LLC, Brownstein Hyatt Farber Schreck (formerly known as Brownstein Hyatt & Farber, P.C.), and The Cohen Group or any of its clients, including Taser International, IBM, Cross Match Technologies, Inc., Sybase, Inc., Zoll Medical Corporation, Alion Science & Technology Corporation, Choicepoint, Allied Defense Industries Incorporated, and Tetra Tech, Inc. from January, 2005 to the present.

We received DHS's January 17, 2007 response to our initial FOIA which included the Federal Procurement Data System (FPDS) report of those contracts agencies within DHS have entered into with the aforementioned companies from January 2005 to the present.

Based on this report, we have narrowed the scope of our request, and seek documents concerning the following:

1.    Procurement action number HSCG3207PE46000 administered by the U.S. Coast Guard with Taser International and any records related to the competitive bidding process used to select Taser Int'l, individual points of contact representing Taser Int'l, unsuccessful proposals submitted for this procurement action, and the price negotiation memorandum for this action;

2.    Procurement action number HSCG5105PQPP061 administered by the U.S. Coast Guard with IBM and any records related to the competitive bidding process used to select IBM, individual points of contact representing IBM, unsuccessful proposals submitted for this procurement action, and the price negotiation memorandum for this action;

3.    Procurement action numbers HSCG4905FQPA002, HSCG2306FMMZ104, HSCG8906P6CS503, HSCGG304FTWV501, and HSCGG805FHCA310 administered by the U.S. Coast Guard with Cross Match Technologies, Inc. and any records related to the competitive bidding process used to select Cross Match Technologies, individual points of contact representing Cross Match Technologies, unsuccessful proposals submitted for this procurement action, and the price negotiation memorandum for this action;

4.     Procurement action number HSCGG806FHJ6071 administered by the U.S. Coast Guard with Sybase, Inc. and any records related to the competitive bidding process used to select Sybase, Inc., individual points of contact representing Sybase, Inc., unsuccessful proposals submitted for this procurement action, and the price negotiation memorandum for this action;

5.     Procurement action number HSCG2406P1GAE90 administered by the U.S. Coast Guard with Zoll Medical Corporation and any records related to the competitive bidding process used to select Zoll Medical Corporation, individual points of contact representing Zoll Medical Corporation, unsuccessful proposals submitted for this procurement action, and the price negotiation memorandum for this action;

6.     Procurement action number HSCG4806PDCLF18 administered by the U.S. Coast Guard with Alion Science & Technology Corporation and any records related to the competitive bidding process used to select Alion Science & Technology Corporation, individual points of contact representing Alion Science & Technology, unsuccessful proposals submitted for this procurement action, and the price negotiation memorandum for this action;

7.     Procurement action number HSCGG806FHFP020 administered by the U.S. Coast Guard with Choicepoint Incorporated and any records related to the competitive bidding process used to select Choicepoint, individual points of contact representing Choicepoint, unsuccessful proposals submitted for this procurement action, and the price negotiation memorandum for this action;

8.     Procurement action numbers DTCG8801N6XB410, DTCG8801N6XA324, DTCG8802N6XA001, HSCG8306J3CL501, HSCG8306J3CL627, HSCG8306J3YD001, HSCG8206P3WC524, HSCG8306J3YD027, and HSCG8307J3WT071 administered by the U.S. Coast Guard with Tetra Tech, Incorporated and any records related to the competitive bidding process used to select Tetra Tech, individual points of contact representing Tetra Tech, unsuccessful proposals submitted for this procurement action, and the price negotiation memorandum for this action;

9.     Procurement action number HSCG4005P59411 administered by the U.S. Coast Guard with Allied Defense Industries Incorporated and any records related to the competitive bidding process used to select Allied Defense, individual points of contact representing Allied Defense, unsuccessful proposals submitted for this procurement action, and the price negotiation memorandum for this action;

10.    Phone logs, meeting records, building access logs or schedules between employees of the U.S. Coast Guard and Chad Wolf, Tom Blank, C. Stewart Verdery, Jr., C. Suzanne Mencer, and Deborah Rosenblum from January 2005 to the present;

11.    Phone logs, meeting records or schedules between employees of the U.S. Coast Guard and any employee of Wexler & Walker, Monument Policy Group, LLC, Brownstein Hyatt Farber Schreck (formerly known as Brownstein Hyatt & Farber, P.C.), and The Cohen Group from January 2005 to the present.

Please search for responsive records regardless of format, medium, or physical characteristics. We seek records of any kind, including electronic records, audiotapes, videotapes, photographs and back-up tapes.

If it is your position that any portion of the requested records is exempt from disclosure, CREW requests that you provide an index of those documents as required under Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1972). As you are aware, a Vaughn index must describe each document claimed as exempt with sufficient specificity "to permit a reasoned judgment as to whether the material is actually exempt under FOIA." Founding Church of Scientology v. Bell, 603 F.2d 945, 959 (D.C. Cir. 1979). Moreover, the Vaughn index must "describe each document or portion thereof withheld, and for **each** withholding it must discuss the consequences of supplying the sought-after-information." King v. United States Dep't of Justice, 830 F.2d 210, 223-24 (D.C. Cir. 1987) (emphasis added). Further, "the withholding agency must supply 'a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply.'" Id. at 224, citing Mead Data Central v. United States Dep't of the Air Force, 566 F.2d 242, 251 (D.C. Cir. 1977).

In the event that some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable non-exempt portions of the requested records. See 5 U.S.C. §552(b) ("Any reasonably segregable portion of a records shall be provided to any person requesting such record after deletion of the portions which are exempt ..."); see also Schiller v. Nat'l Labor Relations Bd., 964 F.2d 1205, 1209 (D.C. Cir. 1992). If it is your position that a document contains non-exempt segments, but that those non-exempt segments are so dispersed throughout the document as to make segregation impossible, please state what portion of the document is non-exempt and how the material is dispersed throughout the documents. Mead Data Central, 566 F.2d at 261. Claims of non-segregability must be made with the same degree of detail as required for claims of exemption in a Vaughn index. If a request is denied in whole, please state specifically that it is not reasonable to segregate portions of the record for release.

## Fee Waiver Request

In accordance with 5 U.S.C. §552(a)(4)(A)(iii) and 6 C.F.R. Part 5.11, CREW requests a waiver of fees associated with processing this request for records. The subject of this request concerns the operations of the federal government and the disclosures will likely contribute to a better understanding of relevant government procedures by CREW and the general public in a significant way. This subject is of particular interest and importance to the public in light of a newspaper report that a substantial number of former officials within DHS have left the Department to obtain lucrative careers as consultants, lobbyists and executives with companies that do billions of dollars' worth of domestic security business with DHS. See Eric Lipton, "Former Antiterror Officials Find Industry Pays Better," The New York Times (June 18, 2006). Moreover, the request is primarily and fundamentally for non-commercial purposes. 5 U.S.C.

3

§552(a)(4)(A)(iii). See, e.g., McClellan Ecological v. Carlucci, 835 F.2d 1282, 1285 (9th Cir. 1987). Specifically, these records are likely to contribute to the public's understanding of the process that DHS uses in contracting with outside security firms/entities.

CREW is a non-profit corporation, organized under section 501(c)(3) of the Internal Revenue code. CREW is committed to protecting the right of citizens to be aware of the activities of government officials and to ensuring the integrity of those officials. CREW is dedicated to empowering citizens to have an influential voice in government decisions and in the government decision-making process. The release of information garnered through this request is not in CREW's financial interest. CREW will analyze the information responsive to this request, and will likely share its analysis with the public, either through memoranda, reports or press releases. CREW has an established record of carrying out these types of activities, as evidenced through its website, www.citizensforethics.org. Currently, the CREW website contains links to thousands of pages of documents acquired from multiple FOIA requests. See http://citizensforethics.org/activities/foia.php. Visitors to CREW's website can peruse the FOIA request letters, the responses from government agencies, and a growing number of documents responding to FOIA requests. CREW's virtual reading room provides around-the-clock access to anyone willing to learn about the government activities that were the focus of CREW's FOIA requests. The CREW website also includes documents relating to CREW's FOIA litigation, Internal Revenue Service complaints, and Federal Election Commission complaints.

Under these circumstances, CREW satisfies fully the criteria for a fee waiver.

## Conclusion

Please respond to this request in writing within 20 days as requested under 5 U.S.C. §552(a)(6)(A)(I). If all of the requested documents are not available within that time period, CREW requests that you provide it with all requested documents or portions of documents that are available within that time period.

If you have any questions about this request or foresee problems in releasing fully the requested records within the 20-day period, please call me within that time period. I can be reached at (202) 408-5565. Also, if CREW's request for a fee waiver is not granted in full, please contact me immediately upon making such a determination. Please send the requested documents to Kimberly Perkins, Citizens for Responsibility and Ethics in Washington, 1400 Eye Street, N.W., Suite 450, Washington, D.C. 20005.

4

Thank you for your attention to this matter.

Sincerely,

Kimberly D. Perkins
Counsel
Citizens for Responsibility and Ethics in Washington

# CREW | citizens for responsibility and ethics in washington

1400 Eye Street, N.W.
Suite 450
Washington, D.C. 20005

U.S. Coast Guard
Attn: FOIA Coordinator
Commandant (CG-611)
2100 2nd Street, S.W.
Washington, D.C. 20593-0001



02 1P                    $ 000.39⁰
000262984 8              MAR 07 2007
MAILED FROM ZIP CODE 20005

# EXHIBIT N

**U.S. Department of
Homeland Security**

**United States
Coast Guard**

Civil Engineering Unit Oakland
2000 Embarcadero, Suite 200
Oakland, CA 94606-5337

Jeffrey A. Cross
Chief of Contracting
e-mail: Jcross@D11.USCG.MIL
Phone: (510) 535-7236
FAX: (510) 535-7233

4290
8 May 2007

Citizens for Responsibility and Ethics in Washington
1400 Eye St., Suite 450
Washington, D.C. 20005

FREEDOM OF INFORMATION ACT (FOIA) REQUEST

We received your request of 7 March 2007 wherein you requested any records regarding
competitive bidding processes used to select Tetra Tech on Delivery Orders DTCG88-01-N-
6XB410, DTCG88-01-N-6XA324, DTCG88-01-N-6XA001.

The delivery orders requested were not solicited using "competitive bidding procedures." Tetra
Tech had an Indefinite-Delivery, Indefinite-Quantity (IDIQ) contract for environmental
professional services. These services were solicited and Tetra Tech was selected using Brooks
Act procedures; "competitive bidding procedures" were not used for the delivery orders in
question. As a result I am unable to provide any information regarding competitive bidding
procedures.. However, I forwarded delivery orders and modifications for all three actions.

The fees as computed in accordance with the regulations published at 49 CFR Part 7, for costs
incurred in responding to your request, are less than $10 and, therefore, administratively waived.

Please direct any further inquiries regarding this matter to me at (510) 535-7236.

Sincerely,

Jeffrey A. Cross
Contracting Officer

Atch(s)

# EXHIBIT O

# CREW | citizens for responsibility and ethics in washington

March 7, 2007

United States Secret Service
245 Murray Drive, Building 410
Washington, D.C. 20223
FOIA Officer/Public Liaison: Latita Huff

Dear Ms. Huff:

This is to follow-up on CREW's January 10, 2007 FOIA request to the U.S. Department of Homeland Security seeking records from any office of DHS that relate in any way to contacts DHS has had with C. Stewart Verdery, Jr., Chad Wolf, and Tom Blank, any contracts DHS has entered into with Monument Policy Group, LLC and Wexler & Walker, or any of its clients, including Cross Match Technologies and Choicepoint from January, 2005 to the present.

We received DHS's January 17, 2007 response to our initial FOIA which included the Federal Procurement Data System (FPDS) report of those contracts agencies within DHS have entered into with the aforementioned companies from January 2005 to the present.

Based on this report, we have narrowed the scope of our request, and seeks documents concerning the following:

1.  Procurement action numbers HSSSC0105F0251, HSSS0106F0021, HSSS0106F0389, HSSS0107F0026 administered by the U.S. Secret Service with Cross Match Technologies and any records related to the competitive bidding process used to select Cross Match Technologies, individual points of contact representing Cross Match Technologies, unsuccessful proposals submitted for this procurement action, and the price negotiation memorandum for this action;

2.  Procurement action numbers HSSS0106F0048 and HSSS0107F0012 administered by the U.S. Secret Service with Choicepoint, and any records related to the competitive bidding process used to select Choicepoint, individual points of contact representing Choicepoint, unsuccessful proposals submitted for this procurement action, and the price negotiation memorandum for this action;

3.  Phone logs, meeting records, building access logs or schedules between employees of the U.S. Secret Service and Chad Wolf, Tom Blank, and C. Stewart Verdery, Jr. from January 2005 to the present;

4.  Phone logs, meeting records or schedules between employees of the U.S. Secret Service and any employee of Wexler & Walker and Monument Policy Group from January 2005 to the present.



Please search for responsive records regardless of format, medium, or physical characteristics. We seek records of any kind, including electronic records, audiotapes, videotapes, photographs and back-up tapes.

If it is your position that any portion of the requested records is exempt from disclosure, CREW requests that you provide an index of those documents as required under Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1972). As you are aware, a Vaughn index must describe each document claimed as exempt with sufficient specificity "to permit a reasoned judgment as to whether the material is actually exempt under FOIA." Founding Church of Scientology v. Bell, 603 F.2d 945, 959 (D.C. Cir. 1979). Moreover, the Vaughn index must "describe each document or portion thereof withheld, and for **each** withholding it must discuss the consequences of supplying the sought-after-information." King v. United States Dep't of Justice, 830 F.2d 210, 223-24 (D.C. Cir. 1987) (emphasis added). Further, "the withholding agency must supply 'a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply.'" Id. at 224, citing Mead Data Central v. United States Dep't of the Air Force, 566 F.2d 242, 251 (D.C. Cir. 1977).

In the event that some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable non-exempt portions of the requested records. See 5 U.S.C. §552(b) ("Any reasonably segregable portion of a records shall be provided to any person requesting such record after deletion of the portions which are exempt ..."); see also Schiller v. Nat'l Labor Relations Bd., 964 F.2d 1205, 1209 (D.C. Cir. 1992). If it is your position that a document contains non-exempt segments, but that those non-exempt segments are so dispersed throughout the document as to make segregation impossible, please state what portion of the document is non-exempt and how the material is dispersed throughout the documents. Mead Data Central, 566 F.2d at 261. Claims of non-segregability must be made with the same degree of detail as required for claims of exemption in a Vaughn index. If a request is denied in whole, please state specifically that it is not reasonable to segregate portions of the record for release.

## Fee Waiver Request

In accordance with 5 U.S.C. §552(a)(4)(A)(iii) and 6 C.F.R. Part 5.11, CREW requests a waiver of fees associated with processing this request for records. The subject of this request concerns the operations of the federal government and the disclosures will likely contribute to a better understanding of relevant government procedures by CREW and the general public in a significant way. This subject is of particular interest and importance to the public in light of a newspaper report that a substantial number of former officials within DHS have left the Department to obtain lucrative careers as consultants, lobbyists and executives with companies that do billions of dollars' worth of domestic security business with DHS. See Eric Lipton, "Former Antiterror Officials Find Industry Pays Better," The New York Times (June 18, 2006). Moreover, the request is primarily and fundamentally for non-commercial purposes. 5 U.S.C. §552(a)(4)(A)(iii). See, e.g., McClellan Ecological v. Carlucci, 835 F.2d 1282, 1285 (9th Cir. 1987). Specifically, these records are likely to contribute to the public's understanding of the

process that DHS uses in contracting with outside security firms/entities.

CREW is a non-profit corporation, organized under section 501(c)(3) of the Internal Revenue code. CREW is committed to protecting the right of citizens to be aware of the activities of government officials and to ensuring the integrity of those officials. CREW is dedicated to empowering citizens to have an influential voice in government decisions and in the government decision-making process. The release of information garnered through this request is not in CREW's financial interest. CREW will analyze the information responsive to this request, and will likely share its analysis with the public, either through memoranda, reports or press releases. CREW has an established record of carrying out these types of activities, as evidenced through its website, www.citizensforethics.org. Currently, the CREW website contains links to thousands of pages of documents acquired from multiple FOIA requests. See http://citizensforethics.org/activities/foia.php. Visitors to CREW's website can peruse the FOIA request letters, the responses from government agencies, and a growing number of documents responding to FOIA requests. CREW's virtual reading room provides around-the-clock access to anyone willing to learn about the government activities that were the focus of CREW's FOIA requests. The CREW website also includes documents relating to CREW's FOIA litigation, Internal Revenue Service complaints, and Federal Election Commission complaints.

Under these circumstances, CREW satisfies fully the criteria for a fee waiver.

### Conclusion

Please respond to this request in writing within 20 days as requested under 5 U.S.C. §552(a)(6)(A)(I). If all of the requested documents are not available within that time period, CREW requests that you provide it with all requested documents or portions of documents that are available within that time period.

If you have any questions about this request or foresee problems in releasing fully the requested records within the 20-day period, please call me within that time period. I can be reached at (202) 408-5565. Also, if CREW's request for a fee waiver is not granted in full, please contact me immediately upon making such a determination. Please send the requested documents to Kimberly Perkins, Citizens for Responsibility and Ethics in Washington, 1400 Eye Street, N.W., Suite 450, Washington, D.C. 20005.

Thank you for your attention to this matter.

Sincerely,

Kimberly D. Perkins
Counsel
Citizens for Responsibility and Ethics in Washington

# CREW | citizens for responsibility and ethics in washington

1400 Eye Street, N.W.
Suite 450
Washington, D.C. 20005

U.S. Secret Service
Attn: FOIA Officer/Public Liason: Latita Huff
245 Murray Drive, Bldg. 410
Washington, D.C. 20223





UNITED STATES POSTAGE
PITNEY BOWES
02 1P                $ 000.39⁰
0000629848    MAR 07 2007
MAILED FROM ZIP CODE 20005

**EXHIBIT P**



**DEPARTMENT OF HOMELAND SECURITY**
UNITED STATES SECRET SERVICE
WASHINGTON, D.C. 20223

Freedom of Information and Privacy Acts Branch
245 Murray Drive
Building 410
Washington, D.C. 20223

Kimberly Perkins                                    APR 27 2007
c/o CREW
1400 Eye Street, NW, Suite 450
Washington, DC 20005

File Numbers: 20070182 - 20070196

Dear Requester:

This letter is intended to acknowledge the receipt of your recent Freedom of Information Act request received by the United States Secret Service on March 15, 2007, for information pertaining to the following:

File no.: 20070182 – procurement action numbers HSSC0105F0251 administered by the U.S. Secret Service with Cross Match Technologies, unsuccessful proposals submitted for this procurement action and the price negotiation memorandum for this action;

File no.: 20070183 – procurement action numbers HSSS0106F0021 administered by the U.S. Secret Service with Cross Match Technologies, unsuccessful proposals submitted for this procurement action and the price negotiation memorandum for this action;

File no.: 20070184 – procurement action numbers HSSS0106F0389 administered by the U.S. Secret Service with Cross Match Technologies, unsuccessful proposals submitted for this procurement action and the price negotiation memorandum for this action;

File no.: 20070185 – procurement action numbers HSSS0107F0026 administered by the U.S. Secret Service with Cross Match Technologies, unsuccessful proposals submitted for this procurement action and the price negotiation memorandum for this action;

File no.: 20070186 – procurement action numbers HSSS0106F0048 administered by the U.S. Secret Service with Choicepoint, unsuccessful proposals submitted for this procurement action and the price negotiation memorandum for this action;

File no.: 20070187 – procurement action numbers HSSS0107F0012 administered by the U.S. Secret Service with Choicepoint, unsuccessful proposals submitted for this procurement action and the price negotiation memorandum for this action;

File no.: 20070188 – any records related to the competitive bidding process used to select Cross Match Technologies;

File no.: 20070189 – any records related to the competitive bidding process used to select Choicepoint;

File no.: 20070190 – individual points of contact representing Cross Match Technologies;

File no.: 20070191 – individual points of contact representing Choicepoint;

File no.: 20070192 – phone logs, meeting records or schedules between employees of the U.S. Secret Service and any employee of Wexler & Walker from January 2005 to present;

File no.: 20070193 – phone logs, meeting records or schedules between employees of the U.S. Secret Service and any employee of Monument Policy Group from January 2005 to present;

File no.: 20070194 – phone logs, meeting records, building access logs or schedules between employees of the U.S. Secret Service and Chad Wolf from January 2005 to present;

File no.: 20070195 – phone logs, meeting records, building access logs or schedules between employees of the U.S. Secret Service and Tom Blank from January 2005 to present;

File no.: 20070196 – phone logs, meeting records, building access logs or schedules between employees of the U.S. Secret Service and C. Stewart Verdery, Jr. from January 2005 to present;

A search for files responsive to your request is being conducted. When the results of the search are known, you will be contacted.

Your request for a fee waiver has been denied. It has been determined that you are an "all other use" requester. As such, you will be charged for fees that will recover the full direct cost of searching for and reproducing records that are responsive to the request, except that the first 100 pages of reproduction and the first two hours of search time shall be furnished without charge.

If you disagree with our determination, you have the right of administrative appeal within 35 days by writing to Freedom of Information Appeal, Deputy Director, U.S. Secret Service, 245 Murray Drive, Building 410, Washington, DC 20223.

Please use the file numbers indicated above in all future correspondence with this office.

We solicit your cooperation and assure you that the search will be conducted as expeditiously as possible.

Sincerely,

Kathy J. Lyerly
Special Agent In Charge
Freedom of Information &
Privacy Acts Officer

# EXHIBIT Q

# CREW | citizens for responsibility and ethics in washington

May 2, 2007

Deputy Director
Freedom of Information Appeal
U.S. Secret Service
245 Murray Drive
Building 410
Washington, DC 20223

Re: <u>FOIA Request File Numbers: 20070182 - 20070196</u>

Dear Sir/Madame:

This is in response to your April 27, 2007 letter which acknowledges receipt of CREW's March 7, 2007 FOIA request for documents and denies CREW's request for a fee waiver. CREW hereby appeals your denial of a fee waiver and requests that you reverse it for the reasons set forth below.

CREW's March 7, 2007 FOIA requested documents related in any way to contracts the United States Secret Service ("Secret Service") entered into with several outside security firms and vendors. <u>See</u> Letter from Kimberly D. Perkins to FOIA Officer/Public Liaison Latita Huff, March 7, 2007 (attached as Exhibit A). Despite CREW's clearly articulated grounds for a fee waiver request, specifically that, "these records are likely to contribute to the public's understanding of the process that DHS uses in contracting with outside security firms/entities," the Secret Service simply denied this request with no discussion whatsoever as to the basis of its denial. <u>See</u> Letter from Secret Service FOIA Officer Kathy J. Lyerly to Kimberly D. Perkins, April 27, 2007 (attached as Exhibit B).

Pursuant to 6 C.F.R. § 5.11(k)(2), CREW fully satisfies the Secret Service's six-part criteria for a complete waiver of fees. First, the records CREW seeks concern "the operations or activities of the government" as they are procurement actions the Secret Service entered into with several outside vendors.

Second, the disclosure of the information sought is likely to contribute significantly to the public understanding of government operations because the records will likely show the "process that DHS uses in contracting with outside security firms/entities." <u>See</u> Letter from Kimberly D. Perkins to Secret Service FOIA Officer/Public Liaison Latita Huff (March 7, 2007). Specifically, CREW has requested documents that pertain to how the Secret Service manages taxpayer money in its award of contracts to vendors. The information received will provide critical information that has not been previously made available to the public. The nature of the information as primary source material rather than secondary reporting will allow the public to engage in a deeper and more specific examination of the administration's management of taxpayer dollars to award contracts to outside security firms and entities.



Deputy Director
May 2, 2007
Page 2

With respect to the third and fourth criteria, the disclosure of the requested information will contribute to the understanding of the public "at large," and the contribution to the public understanding of how the government distributes taxpayer dollars through contracting will be "significant." This subject is of particular interest and importance to the public at large in light of several newspaper reports that a substantial number of former officials within DHS have left the Department to obtain lucrative careers as consultants, lobbyists and executives with companies that do billions of dollars' worth of domestic security business with DHS. See, e.g., Eric Lipton, "Former Antiterror Officials Find Industry Pays Better," The New York Times (June 18, 2006) (attached as Exhibit C); Sarah Posner, Security for Sale, The American Prospect, January 1, 2006 (attached as Exhibit D). Additionally, this information is significant because of the increased attention DHS and its components have received over its mismanagement of taxpayer money through its continuous problems with contracting out. Scott Higham and Robert O'Harrow, Jr., Contracting rush for security led to waste, abuse, The Washington Post, May 22, 2005 (attached as Exhibit E); U.S. Fed News, Rep. Pascrell Lashes Out at Irresponsible Department of Homeland Security Contracts, May 18, 2006 (attached as Exhibit F).

As to criteria five and six, CREW is not seeking the documents for any commercial purpose. Instead, CREW will analyze the information it receives that is responsive to its request, and will share it with the public through memoranda, reports, or press releases. For example, The Washington Post just issued a news-breaking article about the problems with the federal government's distribution of foreign aid to Hurricane Katrina victims that relied significantly on documents CREW obtained through a FOIA request. John Solomon and Spencer S. Hsu, Most Katrina Aid from Overseas Went Unclaimed, The Washington Post, April 29, 2007 (attached as Exhibit G). In addition, CREW will disseminate any documents it acquires from its request to the public through its website, www.citizensforethics.org. Currently, the CREW website contains links to thousands of pages of documents acquired from multiple FOIA requests. See http://citizensforethics.org/activities/foia.php. Visitors to CREW's website can peruse the FOIA request letters, the responses from government agencies, and a growing number of documents responding to FOIA requests. CREW's virtual reading room provides around-the-clock access to anyone willing to learn about the government activities that were the focus of CREW's FOIA requests. The CREW website also includes documents relating to CREW's FOIA litigation, Internal Revenue Service complaints, and Federal Election Commission complaints.

Finally, it should be noted that the U.S. District Court for the District of Columbia recently concluded in CREW v. HHS, a lawsuit CREW filed against HHS after the agency decided that CREW did not qualify for a public interest fee waiver, that the information CREW sought would "likely reveal meaningful information about HHS Operations that is not already public knowledge" and, as such, CREW was entitled to a public interest fee waiver. CREW v. HHS, No. 05-1127 slip op. at 11, 30 (D.D.C. 2006). There, CREW sought documents related to contacts any office of HHS had with any external public affairs firms, any contracts HHS entered into with any public affairs firm and any records of contacts any HHS employee had with any

Deputy Director
May 2, 2007
Page 3

employee of any public affairs firm with which HHS had a contractual relationship. <u>Id</u>. at 2. Similar to the case here, CREW sought this information to share and disseminate to the public through memoranda, reports and its website. <u>Id</u>. at 3. Judge Kollar-Kotelly found that "the informative value of a request depends not on there being certainty of what the documents reveal, but rather on the requesting party having explained with reasonable specificity how those documents would increase public knowledge of the functions of the government." <u>Id</u>. at 13. Here, there is no question that in the wake of the various and extensive reports of contracting waste and mismanagement within the components of DHS there is an increased awareness by the public of the administration's contracting process in the security arena, and the information CREW seeks will add to that awareness by revealing how the Secret Service administers and awards its contracts to security firms and entities.

If you have any questions about this fee waiver appeal please call me at (202) 408-5565. Please send the requested documents to me at Citizens for Responsibility and Ethics in Washington, 1400 Eye Street, N.W., Suite 450, Washington, D.C. 20005.

Sincerely,

Kimberly D. Perkins
Counsel
Citizens for Responsibility and Ethics in Washington

Enclosures

# EXHIBIT R



**U.S. Department of Homeland Security**
## UNITED STATES SECRET SERVICE

July 17, 2007



Kimberly D. Perkins
Citizens for Responsibility and Ethics in Washington
1400 Eye Street, N.W., Suite 450
Washington, DC 20005

> Re: Freedom of Information Act appeal (File Nos. 20070182 through 20070196)

Dear Ms. Perkins:

Reference is made to your letter dated May 2, 2007, and received by the United States Secret Service (Secret Service) on May 17, 2007. Through your letter you appeal the decision of Special Agent in Charge, Kathy J. Lyerly, Secret Service Freedom of Information and Privacy Acts Officer, denying your request for a waiver of fees in connection with the processing of your Freedom of Information Act (FOIA) request.

Pursuant to Department of Homeland Security regulations, 6 C.F.R. 5.11(k)(1), records responsive to a FOIA request may be furnished without charge or at a reduced charge when the disclosure of the requested information is in the public interest, because it is likely to contribute significantly to the public's understanding of the operations of the government; and the disclosure is not primarily in the commercial interest of the requester. Section 5.11(k)(2) further sets forth a six part test to determine if a requestor meets the requirements of section (k)(1).

After carefully reviewing the information you have provided, including the information in your letter of May 2, 2007, it has been determined that you do not qualify for a fee waiver. This determination is based on a finding that it has not been shown that the release of the requested records will significantly enhance the public's understanding of the operations and activities of the Secret Service. Your FOIA request is for documentation related to specific procurement actions, and records of contacts between the Secret Service and certain individuals and companies. You have not provided any information that would lead the Secret Service to conclude that these particular procurement actions and contacts would significantly contribute to the public's understanding of this agency's contracting practices. Therefore, your request for a waiver of fees is denied.

For the purpose of the assessment of fees you have been placed in the category of "all other use" requester. Therefore, pursuant to 6 C.F.R. 5.11 you will be charged for search and duplication fees. Search time will be charged at the hourly rate of the employee engaged in the search. Duplication fees will be charged at a rate of ten cents per page. No search fees will be charged for the first 100 pages of documents and the

first two hours of search time. Further, pursuant to 6 C.F.R. § 5.11(d)(5), no fee is charged if the total charges associated with the request amount to less than $14.00. It is noted that the Secret Service has made a preliminary inquiry into your FOIA request, and it appears that search time may be less than two hours, and the total number of responsive pages may be less than 240. The Secret Service will contact you if the charges will exceed $25.00, pursuant to 6 C.F.R. § 5.11(e).

Your request concerning FOI/PA Nos. 20070182 through 20070196 are being returned to the Secret Service Freedom of Information and Privacy Acts Office for processing in conformance with the decisions set forth in this letter.

Under federal law we are required to advise you that any decision on appeal, including a fee waiver denial, is subject to review in the District Court in the district where the complainant resides, has a principal place of business, or in which the agency records are situated, or in the District of Columbia.

Sincerely,

Brian K. Nagel
Deputy Director

## CIVIL COVER SHEET

JS-44
(Rev. 2/01 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Citizens for Responsibility and Ethics in Washington | U.S. Department of Homeland Security |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF ___11001___ (EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT ___11001___ (IN U.S. PLAINTIFF CASES ONLY) NOTE: In land condemnation cases, use the location of the tract of land involved. |
|---|---|

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Kimberly D. Perkins Anne L. Weismann Citizens for Responsibility and Ethics in Washington 1400 Eye Street, N.W., Suite 450 Washington, D.C. 20005 202-408-5565 | |

### II BASIS OF JURISDICTION
(SELECT ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
● 2 U.S. Government Defendant
○ 3 Federal Question (U.S. Government Not a Party)
○ 4 Diversity (Indicate Citizenship of Parties in item III)

### III CITIZENSHIP OF PRINCIPAL PARTIES (SELECT ONE FOR PLAINTIFF AND ONE FOR DEFENDANT)
( FOR DIVERSITY CASES ONLY!)

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

### IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Select one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**○ A. Antitrust**

☐ 410 Antitrust

**○ B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**○ C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

### ○ E. General Civil (Other)    OR    ○ F. Pro Se General Civil

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant)
☐ 871 IRS-Third Party 26 USC 7609

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation
☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 810 Selective Service
☐ 850 Securities/Commodities/Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act)

| ○ G. Habeas Corpus/2255 | ○ H. Employment Discrimination | ⊙ I. FOIA/PRIVACY ACT | ○ J. Student Loan |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national<br>origin, discrimination, disability, age,<br>religion, retaliation)<br><br>*(If pro se, select this deck)* | ☒ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student<br>Loans (excluding veterans) |

| ○ K. Labor/ERISA (non-employment) | ○ L. Other Civil Rights (non-employment) | ○ M. Contract | ○ N. Three-Judge Court |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability | ☐ 441 Civil Rights-Voting (if Voting<br>Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

5 USC sec. 552. The U.S. Department of Homeland Security has failed to produce records in response to plaintiff's FOIA request.

**VII. REQUESTED IN COMPLAINT**    CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23    DEMAND $ _____ Select YES only if demanded in complaint    JURY DEMAND: ☐ YES ☐ NO

**VIII. RELATED CASE(S)** (See instruction) **IF ANY**    ☐ YES ☒ NO    If yes, please complete related case form.

DATE  7/26/07    SIGNATURE OF ATTORNEY OF RECORD  *[signature]*

INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.